Ronald D. BANKS et al., Plaintiffs,

v.

Joseph HAVENER et al., Defendants.

Civ. A. Nos. 3026-M, 3063-M, 3070-M, 3072-M, 3074-M–3078-M, 3084-M, 3124-M.

United States District Court
E. D. Virginia,
at Alexandria.

Oct. 2, 1964.

---

* Motion for bail pending appeal from this order was denied by Circuit Judge Leonard P. Moore, August 21, 1964.

Fred C. Alexander, Jr., and Edward Semonian, Jr., Alexandria, Va., for plaintiffs.

Chester H. Gray, Corporation Counsel, District of Columbia, John A. Earnest and James M. Cashman, Asst. Corporation Counsel, District of Columbia, Washington, D. C., and Plato Cacheris, First Asst. U. S. Atty., Alexandria, Va., for defendants.

LEWIS, District Judge.

Petitioners are Muslim inmates at the District of Columbia Youth Center at Lorton, Virginia, confined there pursuant to sentence under the Federal Youth Corrections Act.[1] They filed separate suits under the Federal Civil Rights Act.[2] Counsel were appointed and the cases were consolidated for hearing.

Petitioners complain of discrimination on the basis, and in the practice, of their religion which they profess to be Islam, as taught by their spiritual leader Elijah Muhammad, in violation of their rights as guaranteed by the First and Fourteenth Amendments of the United States Constitution. They claim they are denied the rights and privileges accorded other religious faiths at the Youth Center and here seek injunctive relief against the respondent prison officials, directing them specifically to provide for the following to the same extent as such right or privilege is granted to other faiths at the institution:

(1) Regularly designated places and times for religious services and meetings.

(2) Correspondence with local Muslim ministers within allowable mail limitations and in conformity with normal prison procedures.

(3) Religious meetings conducted by authorized local Muslim ministers.

(4) Ordering and subscribing to publications and educational literature pertaining to their religion.

(5) The granting of certain dietary considerations required by the tenets of their faith. Petitioners claim very little consideration has been given to these requirements.

(6) Permission for the inmates to receive and possess copies of the Koran and prayer books pertaining to their religion.

(7) The possession and display of religious medals.

Some of the petitioners complain of punishment received for violating the rules of the institution. No extraordinary cruel or inhuman punishment or treatment considerably different from that customarily administered in a penal institution having been established, these complaints were dismissed.

The record as made in these cases is quite voluminous. It contains numerous exhibits and more than five hundred pages of live testimony. Portions of the record as made in Fulwood v. Clemmer, D.C., 206 F.Supp. 370, were incorporated therein by reference.

The material facts in these cases, in the main, are undisputed. They are as follows.

On July 18, 1962, Donald C. Clemmer, Director of the District of Columbia Department of Corrections, pursuant to a letter of assurances filed with and incorporated in the order of the United States Court of Appeals for the Fourth Circuit in Sewell v. Pegelow, 304 F.2d 670, permitted the free exercise of Muslim rituals and doctrines, including the right to preach their beliefs, in a designated meeting place three times a week with a local Muslim minister presiding (although such meetings were monitored on occasions by various members of the prison staff and written notes of their observations made), the right to correspond with Elijah Muhammad, the right to wear and display a non-danger-

1. Title 18 U.S.C. § 5010.

2. Title 42 U.S.C. § 1983; Title 28 U.S.C. § 1343.

ous religious medallion, and the purchase by the prison officials of copies of the Koran for the Muslim believers.

After approximately three weeks of organized Muslim practice at the Youth Center, during which some nine meetings were held, there ensued on July 31st a violent reprisal against prison authority causing personal injury to some prison employees and extensive property damage, and still another disturbance on August 21st as some of the fifty-seven identified participants in the riot were being transferred to the District of Columbia Jail.

Upon investigation, the Director being of the opinion that the Muslims were the motivating influence of the riot—and this is not without some support in the record—the privileges previously granted were taken away, and since that time the inmates at the Youth Center have not been permitted to engage in any formal Muslim activity. (They have been permitted to hold small informal meetings from time to time in the yard during recreational periods, and one copy of the Koran has been available for limited use. One inmate now receives the publication *Muhammad Speaks* and others may now subscribe if they so desire.)

The Director of the District of Columbia Department of Corrections says he prohibited the practice of the Muslim faith at the Youth Center because it constitutes a clear and present danger to the security of the institution and its inmates, and because it creates tension which seriously jeopardizes the therapeutic program instituted for the rehabilitation of the prisoners. He bases these conclusions upon the disturbances of 1962 and his readings on the subject.

The situation which now exists at the Youth Center is generally the same as that which prevailed prior to the 1962 riots. Many of the inmates who were active participants in the riots are still at the Youth Center. The number of guards is inadequate (according to the officials of the Youth Center) to insure the safety of the inmates if another riot should occur.

The Director further says the teachings and dogma of the Muslims—hatred of the white man—supremacy of the Negro race and separation of the races —together with a disavowment of any degree of loyalty to the United States Government and lack of respect for its officials, is disruptive of the rehabilitative concept of confinement at the Youth Center calling for an atmosphere of harmony free of tension—their close cohesion—their recalcitrant attitude and their lack of regard for authority antagonizes the other inmates and the staff and creates a situation in which the rehabilitative program cannot and will not work.

Adherents of other religions (Protestants and Catholics) participated in the 1962 riots. These religions were neither suppressed nor curtailed.

The allowance of other religious groups to hold services at the Youth Center while denying that right to the Muslims violates the order of the Commissioners of the District of Columbia requiring prison officials to make all facilities available without regard to race or religion—the letter of assurances given the United States Court of Appeals for the Fourth Circuit—and their constitutional right (freedom of religion), say the petitioners.

■ Considerable evidence was adduced explaining the dogma of the Muslims and its purported effect upon its adherents, none of which here need be recited. Suffice it to say, the Black Muslim movement as here taught and followed is a religion. It has been so held in Fulwood v. Clemmer, D.C., 206 F. Supp. 370; Sewell v. Pegelow, 4 Cir., 304 F.2d 670; Brown v. McGinnis, 10 N. Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791.

The record further discloses that the Director of the Department of Corrections [3] permits the practice of the Muslim

3. Supervises all penal institutions in the District of Columbia, including the Jail, the Reformatory and the Youth Center.

faith in both the District of Columbia Jail and the Lorton Reformatory. This, say the petitioners, evidences further unlawful discrimination.[4]

The Director justifies his position at the Youth Center, in the main, on the alleged cause of the 1962 riots—the probability of subsequent riots—the disruptive effect on the rehabilitative program of the Youth Center and the antipathy of the other inmates and the staff.

Here the evidence is not conclusive that the 1962 riots were instigated or lead by members of the Black Muslims. (Other inmates equally participated in the riots.)

The probability of Muslim-inspired future riots is speculative at best. (There is no evidence to sustain this contention.) The antipathy of the other inmates and the staff, occasioned by the Muslim belief in black supremacy, standing alone is not sufficient to justify the suppression of religious freedom in the Youth Center; neither is the alleged disruptive effect on the rehabilitation program. (There was little, if any, substantive evidence to support this allegation.) To justify the prohibition of the practice of an established religion at the Youth Center the prison officials must prove by satisfactory evidence that the teachings and practice of the sect create a clear and present danger to the orderly functioning of the institution.[5] This they have not done.

The Supreme Court of the United States, in passing upon the limitations that can be imposed upon the freedom of religion, said in Cantwell v. Connecticut, 310 U.S. 296, at pp. 303, 304, 60 S.Ct. 900, at p. 903, 84 L.Ed. 1213:

" * * * Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment [First] embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a state may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee. * * * "

Although this case does not specifically deal with religious freedom in penal institutions, it is quite analgous and very persuasive. The right to practice one's religious beliefs, there discussed, was subject only to regulation for the protection of society. Such regulation (for the benefit of the inmates) is equally applicable in a penal institution.

" * * * it has never been held that upon entering a prison one is entirely bereft of all of his civil rights and forfeits every protection of the law." (See Sewell v. Pegelow, 4 Cir., 291 F.2d 196.)

The order of the Commissioners of the District of Columbia, promulgated November 25, 1953, requiring prison officials to make facilities available without regard to race or religion does not exempt the Youth Center. The Director has proffered no legal justification for the discrimination there imposed and we find none.

Therefore, an appropriate order will be entered herein permitting all inmates at the Youth Center who are adherents of the Muslim faith to practice their religion at the Youth Center on a non-discriminatory basis so long as it does not present a clear and present danger to the orderly functioning of the institution.

4. See Fulwood v. Clemmer, supra.

5. Brown v. McGinnis, supra.

Lest there be no misunderstanding, the practice of this right (religious freedom) in a penal institution is not absolute—it is subject to rules and regulations necessary to the safety of the prisoners and the orderly functioning of the institution. Adherents of the Muslim faith, or of any other religious sect, found guilty of violating established prison rules will not be heard to plead religious persecution, absent unusual circumstances.

Counsel for the plaintiffs should forthwith prepare an order in accordance with this memorandum opinion, submit it to counsel for the defendants for approval as to form, and then present it to the Court for entry.