George 3 X. C. DESMOND, Petitioner,

v.

Olin G. BLACKWELL, Warden, United States Penitentiary, Lewisburg, Pennsylvania, Respondent.

No. 551.

United States District Court
M. D. Pennsylvania.

Oct. 23, 1964.

John P. Campana, Williamsport, Pa., for petitioner.

Bernard J. Brown, U. S. Atty., Scranton, Pa., Harry A. Nagle, Asst. U. S. Atty., Lewisburg, Pa., Clair Kripe, Attorney, Department of Justice, Bureau of Prisons, Washington, D. C., for respondent.

FOLLMER, District Judge.

Petitioner, a prisoner at the United States Penitentiary, Lewisburg, Pennsylvania, instituted, in forma pauperis, an action designated in habeas corpus. At the hearing had thereon, it was agreed by all parties that the petition should be considered as a civil action for deprivation of rights under 42 U.S.C. § 1983.

Petitioner is a member of a group which call themselves "Muslims", at the head of which there is an individual who calls himself "Muhammad" (referred to

during the hearing as a messenger of Allah). Whether it is properly within the term "religion" is a controverted issue. It has been aptly described by the Second Circuit in Piercé v. LaVallee, 319 F.2d 844 (1963), as "the 'Muslim Brotherhood'—a self-organized and self-styled group having as its avowed object the study and furtherance of Islam, but which also had overtones of secrecy and intrigue",[1] and the Seventh Circuit in Cooper v. Pate, 324 F.2d 165, 166 (1963) refers to "certain social studies which show that the Black Muslim Movement, despite its pretext of a religious facade, is an organization that, outside of prison walls, has for its object the overthrow of the white race, and inside prison walls, has an impressive history of inciting riots and violence." For the purposes of this case, however, Respondent took the position that he was willing to assume that the Nation of Islam, to which the Petitioner adheres, is a religion (Transcript of Hearing, Page 66). In the present proceeding, moreover, no purpose would be served by attempting to decide this issue since considered in the light most favorable to Petitioner, his cause of action cannot be sustained.

Petitioner summarized the issues raised in his petition as the right to ministry by a person of his own faith, subject to the approval of the prison officials; the right to receive religious teachings from Mr. Elijah Muhammad, which includes "Muhammad Speaks" and the "Salaam" magazine; and the right to correspond with Mr. Muhammad himself (Transcript of Hearing, Pages 37 and 39).

The credible testimony here fully justifies the conclusion that the Director of the Bureau of Prisons, in his overall supervision, and the officials in charge of this penitentiary, have exercised admirable restraint in dealing with a most difficult situation consistent with maintaining the necessary discipline, orderly administration and safety as well as the general welfare of a large prison population.

■ It has been fully recognized that as was stated in In re Ferguson et al., 55 Cal.2d 663, 12 Cal.Rptr. 753, 758, 361 P. 2d 417, 422 (1961), cert. den. Ferguson v. Heinze, 368 U.S. 864, 82 S.Ct. 111, 7 L.Ed.2d 61, "Even as prisoners, petitioners have the absolute right to possess their Muslim beliefs. * * * Nor may petitioners be punished for holding their Muslim beliefs." With this I find that there has been full compliance by the prison authorities.

■ On the other hand, as far as action or conduct is concerned, it should be recognized that prison officials must be vested with the necessary discretion in conducting a proper penitentiary and as incident thereto, in safeguarding the prisoners committed to their custody, the prison personnel and the general public. In Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), the Supreme Court recognized that "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." As stated by Judge Brennan in Piercé v. LaVallee, D.C.N.D.N.Y., 212 F.Supp. 865, 869 (1962),

"In our zeal for the protection of freedom of religious belief and practice, the particular circumstances involved may not be overlooked. A large prison population is committed to the custody of a minority of prison employees and authorities. Discipline is necessary for the protection of both the inmates and the public. Prison discipline may on occasions impinge upon fundamental rights. That a public officer has or will violate the constitutional safeguards of the freedom of religion, in this court's opinion must be established by convincing evidence. Such a charge is easy to make in an unveri-

---

1. In Piercé v. LaVallee, D.C.N.D.N.Y., 212 F.Supp. 865, 869 (1962), the District Court considers it "not a religion" but rather as "an organization which sets itself up as an adjunct to the Islamic faith."

fied complaint but the charging party must support it by more than inference or conjecture."

At their so-called "religious meetings" although the words "Brotherly Love" were written on the blackboard, they were actually meetings devoted to the doctrine of "hate". There were open references to those supervising the meetings as "monsters of inferior intelligence" and there were discussions and references to Armagedon in 1970 when the White race would be exterminated. When they were permitted to meet in the Chapel, half of the meeting was devoted to ridicule and disparaging remarks concerning the Christian and Jewish faiths, and all the things in the Chapel "including what the Catholics call the Stations of the Church (sic) that lined both walls and the altar".[2] They were subsequently assigned a meeting room and a regular time for meeting was designated. At these meetings there were references to the white man as "devil" and "skunk". Although the supervision of the meetings of the various religious groups consisted of spot checks, it became necessary because of the manner in which the Muslim meetings were conducted to assign institutional employees for continuous supervision, thus depleting the available force for other duties. When the meetings were supervised the attendance declined until on February 1, 1963 five attended and although the time and place of a weekly meeting has been routinely announced in the same manner as for other groups, no one has attended. At their meetings certain members constituted a guard known as the Fruit of Islam (F.O.I.) who were trained similar to a military group, that supervised the meetings and guarded the entrance. The literature such as "Mr. Muhammad speaks" which was found on prisoners at various times (e. g. Respondent's Exhibits Nos. 3, 4 and 5) was of an inflammatory nature.

There were complaints from other Negroes (who were abiding by regulations) that the Muslim group was attempting to recruit more members and was pressuring and threatening and doing a lot of name calling. In one instance at least, an assault and a stabbing occurred as the result of members of the Muslim group attempting to get another person to join their faith. The various occurrences fully confirmed the previous experience of the authorities that proselyting constituted a custody hazard and regulations prohibiting it are fully justified. When it became necessary to take disciplinary action against one of their group, the entire group in at least one instance approached the control center of the institution and demanded the release from administrative segregation of that prisoner. There would also be group interference with officers attempting to preserve order where one of their group was involved, and conduct generally in the nature of insubordination.

The penitentiary at Lewisburg is a maximum security institution but I find that by a wise and judicious administration of reasonable regulations enforced in connection with the maintenance of a reasonable discipline, the dangers and hazards presented have been kept at a minimum. That such hazards and potential dangers are present, however, is borne out not only by the experiences in this institution but by that known to

2. One witness testified that at one meeting a member (an inmate) gave a talk using periodicals and "On the blackboard he made three strokes with the crayon, and then he proceeded to eliminate two out of the three, since he had said there wasn't any Trinity, that it was a myth. The first stroke which represents God or Allah, he say that is O.K. in so many words. There is nothing wrong with that. We will leave that alone. He goes to the second stroke, he says that is the Son, and he says what Father would be stupid enough to sacrifice his Son on the cross, and then he makes an X that eliminates the Son.

"He goes and makes a mark which is the Holy Ghost. He asks the question, 'Do you know what color a ghost is? He is white, but this is man's devil', and he nixed that, and that is the Trinity." (Transcript of Hearing, Pages 139 and 140.)

the authorities in other institutions.[3] That this group has presented a disciplinary problem not only here but in other penal institutions is excellently stated by the Second Circuit in Sostre v. McGinnis, 334 F.2d 906 (1964).

 As far as the particular complaints of the petitioner in the instant proceeding are concerned, I find that there is no merit in the allegation that he has been denied ministry by a person of his own faith. The decisive answer is that no request has ever been made for the admission to the institution of an accredited representative of the group. With reference to "literature", there is no evidence that any request has been refused, or indeed any such request made, for any legitimate Islamic material.[4] The refusal to admit the inflammatory material requested by Desmond was fully justified.[5]

Desmond included in his list of persons for approved correspondence a Mr. Walcott (as his home town minister) and Mr. Muhammad. As to Mr. Walcott, he was informed of the petitioner's request and the usual inquiry was made whether he wished to correspond and no reply was received from him. Therefore there was no basis for his approval. As to Mr. Muhammad, it is the policy of the institution not to permit a prisoner to correspond with the head of his religious group and Mr. Muhammad claims to be the head of the "Nation of Islam" movement. This, however, applies to all religious groups and is predicated upon the proposition that all contacts from the prison to people on the outside must indicate that it is of a constructive nature, that the head of an organization basically is responsible for the administration of the organization, that the correspondence should be to people "assigned by the heads of the organization down far enough to resolve it, and then from this direction go up. * * * To maintain good wholesome ties in the community, working toward ultimate release planning." (Transcript of Hearing, Pages 73 and 74). This would appear to be a reasonable regulation, but there is a further reason as far as Mr. Muhammad is concerned, namely, that he is an ex-convict, having served time in two federal institutions (Transcript of Hearing, Page 83).

 Certainly with the administration of a large prison population committed to a limited personnel, the responsible prison authorities must be vested with discretion in the admission of persons to the institution and in the persons approved for correspondence. It cannot be dictated by the prisoners and as to the present issue, is reasonable, justifiable and definitely not arbitrary or capricious.[6] I find that Desmond has been accorded every right to which he was entitled consistent with the proper administration of the institution by the authorities.

Order will be entered denying the petition.

---

3. Testimony of Blunt (District of Columbia Department of Corrections) Transcript of Hearing, Page 146 et seq., and Albert Mercer (Lorton, Virginia), Transcript of Hearing, Page 156 et seq.

4. In a letter of December 13, 1963, from the Warden to the legal counsel to the Director of the Bureau of Prisons concerning Desmond (Exhibit "B"–1 to the Response) it was stated:
 "He is also permitted to purchase the Islamic material from the Islamic Center, Washington, D. C., and this includes such books as Mohammed the Prophet, Essentials of Muslim Prayer, Fasting Guide, Muslim Calendar with times of prayer, The Holy Quran Arabic Text by Maulana Mohammed Ali, The Holy Quran by A. Yusaf Ali, and the Holy Quran in English by M. J. Dawood."

5. Petitioner introduced in evidence an issue of "Muhammad Speaks" which was not as inflammatory as the others, but it would be unreasonable to require the censorship to include the reading of every page of every magazine coming into the institution for approximately 1646 prisoners.

6. Especially with reference to Mr. Muhammad, having in mind the inflammatory nature of his writings.