EVERETTE E. X. COOKE, PLAINTIFF-APPELLANT, v. JOHN
W. TRAMBURG, COMMISSIONER OF INSTITUTIONS AND
AGENCIES, DEFENDANT-RESPONDENT.

Argued November 18, 1963—Reargued October 19, 1964—
Decided December 14, 1964.

Mr. *Louis B. Zavin* argued the cause for plaintiff-appellant.

*Mr. Leonard Etz,* attorney for American Civil Liberties Union, participated, as *amicus curiae,* at the hearings before the trial court on the remand and withdrew before second argument.

*Mr. Eugene T. Urbaniak,* Deputy Attorney General, argued the cause for defendant-respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney for defendant-respondent).

The opinion of the court was delivered by

SCHETTINO, J. Plaintiff, a member of the Black Muslim movement, was confined at the New Jersey State Prison serving a sentence for larceny.[1] He requested the Board of Managers of the New Jersey State Prison to grant to the Black Muslims confined therein the right to assemble in a chapel or other appropriate place of worship and furthermore to permit a Minister of the Black Muslim movement to preach to the congregation assembled there. The Board of Managers denied plaintiff's request on the ground that if permission were granted, the practice would be inimical to the maintenance of prison welfare.

Defendant points out that in the exercise of the Board's discretion Black Muslims are allowed the following liberties which are in the nature of the exercise of religious beliefs. Black Muslims are permitted to receive religious tracts in prison, they may purchase their Qu'ran, and may read it in their cells, they are permitted to gather together in the exercise yard up to six in number, and discuss the Qu'ran, Muslimism and Islam if done orderly and in quiet voice. Moreover, they can have a Black Muslim minister placed on their visiting list and the minister may visit each one and give him private

---

[1] Although plaintiff is no longer confined at the New Jersey State Prison, the action instituted was in the nature of a class proceeding. Furthermore, we believe that public interest requires us to decide the cause. *State v. Perricone,* 37 *N. J.* 463, 469 (1962) ; 132 *A. L. R.* 1185 (1941).

counselling without anyone's listening in; and also they have writing privileges to their ministers.

Plaintiff appealed the Board's decision to the Appellate Division pursuant to *R. R.* 4:88–8.[2] Before argument, we certified the cause on our own motion. After oral argument before us we ordered the matter referred to the Superior Court for the taking of testimony of the basis of the Board's rule or regulation.

The Board of Managers made no determination concerning the religious status of the Black Muslim movement. We need not decide the question as even were we to proceed under the assumption that it is a religion, we reach the same conclusion.[3]

Both the Constitution of the United States and the Constitution of the State of New Jersey provide for freedom of religious worship.[4] But we note that in *Cantwell v. State of Connecticut*, 310 *U. S.* 296, 60 *S. Ct.* 900, 84 *L. Ed.* 1213 (1939), the Supreme Court distinguished between the two concepts embodied in the First Amendment, namely, the freedom to believe and the freedom to exercise one's belief. It pointed out that the first is absolute while the second is not and furthermore that the freedom to act is subject to regulation for the protection of society. See also *Reynolds v. United States*, 98 *U.S.* 145, 25 *L. Ed.* 244 (1879); *Davis v. Beason*,

[2] Although Mr. Tramburg was the defendant named in the original pleading, the real defendant is the Board of Managers whose administrative action is the one at issue.

[3] Religious characterization of the Black Muslim movement has been varied. Compare *Fulwood v. Clemmer*, 206 *F. Supp.* 370 (*D. C.* 1962), with *Sostre v. McGinnis*, 334 *F. 2d* 906 (2 *Cir.* 1964). See 75 *Harv. L. Rev.* 837, 838–9 (1962).

[4] The First Amendment of the United States Constitution provides:
"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."
This provision is equally applicable as a prohibition against the states through incorporation of the First Amendment into the Fourteenth Amendment. *Cantwell v. State of Connecticut*, 310 *U. S.* 296, 60 *S. Ct.* 900, 84 *L. Ed.* 1213 (1939).
*Article* I, *par.* 3 of the New Jersey Constitution provides:
"No person shall be deprived of the inestimable privilege of worshiping Almighty God in a manner agreeable to the dictates of his own conscience; * * *."

133 *U. S.* 333, 10 *S. Ct.* 299, 33 *L. Ed.* 637 (1890). The latter concept is clearly applicable to a penal institution. *Banks v. Havener*, 234 *F. Supp.* 27 (*E. D. Va.* 1964).

These principles were followed in *McBride v. McCorkle*, 44 *N. J. Super.* 468 (*App. Div.* 1957). There the court noted that while freedom to believe is absolute, freedom to exercise one's belief is not and must be considered in light of the general public welfare. With particular reference to a prison inmate the court held that although attendance at Mass on Sundays and Holy Days as prescribed by the Roman Catholic Church is the "exercise" of religion, a prisoner who, in common with 30 other men in the segregation wing of the State Prison, was prevented from attending Mass on Sundays and Holy Days was not thereby subjected to cruel and unusual punishment or deprived of his constitutional right of free exercise of his religion.

In *Reynolds, supra*, the Supreme Court upheld a Mormon's conviction for bigamy against the defense of interference with religious freedom as guaranteed by the First Amendment. Chief Justice Waite there stated (98 *U. S.*, at *p.* 166, 25 *L. Ed.*, at *p.* 250): "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?"

In *State v. Perricone*, 37 *N. J.* 463 (1962), cert. denied 371 *U. S.* 890, 83 *S. Ct.* 189, 9 *L. Ed. 2d* 124 (1962), we held that where parents who were Jehovah's Witnesses had refused to grant permission for necessary blood transfusions for their infant, the finding that the parents were guilty of neglect and the appointment of a guardian for the purpose of consenting to blood transfusions were not violative of either the Federal or State Constitutions. We pointed out that where the interests of society as a whole necessitate a course of action, they have been held paramount to certain personal freedoms including religious ones.

 Although a convict, upon his admission to a prison, does not forfeit all his civil liberties, *Sewell v. Pegelow*, 291 *F. 2d* 196 (4 *Cir.* 1961); *Coffin v. Reichard*, 143 *F. 2d* 443, 155 *A. L. R.* 143 (6 *Cir.* 1944) cert. denied 325 *U. S.* 887, 65 *S. Ct.* 1568, 89 *L. Ed.* 2001 (1945), the discipline required to maintain the proper functioning of the prison community may curtail such liberties. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 *U. S.* 266, 285, 68 *S. Ct.* 1049, 1060, 92 *L. Ed.* 1356, 1369 (1948). See also *McBride, supra; Sostre, supra; Brown v. McGinnis*, 10 *N. Y. 2d* 531, 225 *N. Y. S. 2d* 497, 180 *N. E. 2d* 791 (*Ct. App.* 1962). Compare *In re Ferguson*, 55 *Cal. 2d* 663, 12 *Cal. Rpt.* 753, 361 *P. 2d* 417 (*Sup. Ct.* 1961); cert. denied *Ferguson v. Heinze*, 368 *U. S.* 864, 82 *S. Ct.* 111, 7 *L. Ed. 2d* 61 (1961).

 That constitutionally required rights can be subjected to proper limitation is clear. The issue before us relates to whether the limitations here imposed fall within the proper exercise of administrative prerogatives. We emphasize the court's somewhat limited function in this field as pointed out by Judge Goldmann in *McBride, supra* (at *p.* 477):

"Courts are not required to supervise the administration of prison rules and regulations and prison disciplinary procedures. To do so would effectively disrupt prison administration and contravene public policy. * * * Such matters are left to the discretion of prison authorities so long as their conduct does not involve deprivation of the prisoner's constitutional rights and is not clearly capricious or arbitrary."[5]

Defendant pointed out that the administration of six New Jersey penal institutions, containing approximately 2800 men, includes the responsibility for the maintenance of the safety and welfare of the prison community, *i. e.*, protection of community harmony from the actions of the few and protection

---

[5] In *Childs v. Pegelow*, 321 *F. 2d* 487, 489 (4 *Cir.* 1963), cert. denied, 376 *U. S.* 932, 84 *S. Ct.* 702, 11 *L. Ed. 2d* 652 (1964) the Court stated: "[E]xcept in extreme cases, the courts will not interfere with the conduct of a prison, with the enforcement of its rules and regulations, or its discipline."

of prisoners from each other. Defendant claims that the Black Muslims are attempting to shackle the performance of this responsibility.

Dr. Henri Yaker, consulting psychologist to the New Jersey State Prison, stated:

> "Nominally, the Black Muslims teach a doctrine of normative Islamic theology and doctrine. Their scripture is the Qu'ran laying forth all the tenets of Islam—the supremacy and unity of Allah, doctrines of sin, repentance, salvation and the absolute submission to the will of Allah, to be a Muslim, and to find inner peace and submission through the faith to 'surrender' (Islam), the doctrine of the appointed messenger (Madhi), and the prophetic place of Muhammed, the teacher. Over this normative doctrine Elijah Muhammed, with his lieutenants, has superimposed a new set of teachings, which gives the basic raison d'etre of the movement, these teachings being summarized in Elijah Muhammed's catechism, *The Supreme Wisdom.*"[6]

The basic tenet of the movement is the segregation of the races, including hatred of the Caucasian Race—both Christians and Jews. "The truth of the white race and kind will make all black mankind hate them, regardless of their color —black, brown, yellow or red."[7] The white race is referred to as the enemy or the devil and Black Muslim lessons preach:

> "Why does Muhammed or any Muslim murder the devil? What is the duty of each Muslim in regard to four devils? What reward does a Muslim receive by bringing and presenting four devils at one time?
>
> ANSWER: Because he is 100% wicked and cannot keep and obey the laws of Islam. His ways and actions are like a snake of the grafted type. So Muhammed learned that he could not reform them, so they had to be murdered. All Muslims will murder the devil because they know he is a snake and if he be allowed to live he would sting someone else.
>
> Each Muslim is required to bring 4 devils and by bringing and presenting 4 at one time his reward will be a button to wear on the lapel of his coat as a free transportation to the Holy City of Mecca to see brother Muhammed."[8]

Occurrences experienced by New Jersey prison authorities involving Black Muslim inmates have two basic patterns: one where Caucasians or other Negroes are driven to disrupt

---

[6] Henri M. Yaker, "The Black Muslims in the Correctional Institution," *The Welfare Reporter*, October 1962, *p.* 158, 159. Published by New Jersey Department of Institutions and Agencies.

[7] *The Supreme Wisdom, Elijah Muhammed, Vol. Two, p.* 27.

[8] Lesson Number 10. Paper taken from prisoner at Rahway Prison.

prison discipline, and the second where Black Muslims themselves cause upheavals. The first relates to situations where inmates have been stabbed, escaped, prevented from receiving full ration of food or caused other groups to threaten retaliation. At the Rahway Prison Farm, two white men attacked three Black Muslims, stabbing two of them. The attackers indicated that their acts had been prompted by Black Muslim threats.

At the Annandale Reformatory, a Negro inmate was driven to an unsuccessful escape by the pressures brought to bear on him by other Negroes who were members of the movement. When pork has been served at a prison meal (Black Muslim dietary laws prohibit the consumption of pork) other Negroes have been pressured into refusing the meal or have been forced to request official assistance to secure the meal.

The Black Muslims also subscribe to the doctrine of "What you do to my Brother, you do to me," which disrupts prison discipline whenever they activate their understanding of this command. Where, in their view, a prison official commits an injustice to a fellow Black Muslim, they, en masse, would demand the same punishment in an attempt to coerce the official from his stated action. Moreover, the prisoners make the determination then and there. And regardless of what the prison authorities do or say, the Black Muslims stubbornly adhere to their determination.

Trenton State Prison was the scene of one incident arising out of this doctrine. A Black Muslim leader was talking to a group of inmates in the prison yard in a loud voice contrary to the rules. When the leader was requested to lower his voice by an officer, he refused to do so and stated that he would rather be removed from the yard. The guard thereupon started to take him out and upon reaching the gate, the officer found that 15 other Black Muslims had banded together and wanted to leave the yard with the leader. Disobeying the officer's order not to leave, they pushed past him and left the yard.

At the Rahway State Prison inmates were permitted to congregate in the yard in groups of six (subsequent to incidents

within the prison, the number was reduced to four) but instead they attempted to circumvent the rules and form one large group of members of the Black Muslim movement.

These incidents in the New Jersey prisons are not uniquely homegrown ones. Prison authorities in several other states have been faced with similar problems arising out of the Black Muslim movement. Rioting and breaches of discipline have erupted in New York[9], California[10] and the District of Columbia[11].

---

[9] *Sostre v. McGinnis, supra* (where a Black Muslim inmate's life was threatened for preaching the subjugation of the Caucasian Race, where riots have broken out prompted by disputes over religiously unacceptable food, proselytizing in the exercise yard and refusals by individual Black Muslims to obey white guards and where there have been attempted sit down strikes in protest of the punishment of a member).

[10] *In re Ferguson, supra* (where prison officials were surrounded by 20 members of the Black Muslim group when they attempted to search two brother inmates and where Black Muslim inmates have had to be forceably subdued when questioned or searched concerning Black Muslim literature).

[11] *Banks v. Havener, supra* (where the Director of the District of Columbia Department of Correction permitted the free exercise of Black Muslim rituals and doctrines, including the right to preach their beliefs in a designated meeting place three times a week with a local Black Muslim minister presiding (although such meetings were monitored on occasions by various members of the prison staff and written notes of their observations made), the right to correspond with Elijah Muhammed, the right to wear and display a nondangerous religious medallion and the purchase by the prison officials of copies of the Koran for the Black Muslim believers.

After approximately three weeks of organized Black Muslim practice at the Youth Center, during which some nine meetings were held, there ensued a violent reprisal against prison authority causing personal injury to some prison employees and extensive property damage, and still another disturbance three weeks later as some of the 57 identified participants in the riot were being transferred to the District of Columbia Jail.

The Director was of the opinion that the Black Muslims were the motivating influences of the riots and took away the religious privileges.

We note that the court there restored these privileges on the ground that such Muslim practices were allowed in the other two prisons under the jurisdiction of the same Director under a general order of the Commissioners of the District of Columbia).

In *In re Ferguson, supra,* Black Muslim prisoners alleged that they were not allowed a place to worship, that their religious meetings were broken up, that they were not allowed to discuss their religious doctrines, that they were not allowed to possess an adequate supply of religious literature, that their religious leaders were not permitted to visit them and that prison authorities confiscated an inmate's religious scrapbook. The court upheld the regulations as a reasonable exercise of the Director of Correction's discretion.

From all the authorities, one concept clearly appears, namely, that prison society is a very sensitive and explosive one. In *Sostre, supra* (334 *F. 2d,* at *p.* 908), Judge Hays pointed out that the principal problem of prison administration is the maintenance of discipline and that "No romantic or sentimental view of constitutional rights or of religion should induce a court to interfere with the necessary disciplinary regime established by the prison officials." We agree with his expressions. We add that what is "the necessary disciplinary regime" is for the prison officials to decide for they and not the courts are the experts in the field. Their determinations are limited only by proof that their actions are either capricious or arbitrary. *McBride, supra* (44 *N. J. Super.* 477).

Here, the Board determined, in its expert judgment, that the requested collective worship would bring about disruption of prison discipline. We cannot say on this record that it is either capricious or arbitrary in so ruling.

Affirmed, no costs.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.