James X. C. LONG, Appellant,

v.

Jacob J. PARKER, Warden, United States Penitentiary, Lewisburg, Pennsylvania.

Maurice X. WALKER, Edward X. Brown, Ronald X. D. Hector, Ruben X. Jackson and Joseph X. C. Carlisle, Appellants,

v.

Ramsey CLARK, Attorney General, U. S. Justice Department, and Jacob J. Parker, Warden, United States Penitentiary, Lewisburg, Pennsylvania.

Nos. 15981, 16159.

United States Court of Appeals Third Circuit.

Argued Sept. 25, 1967.

Decided Feb. 16, 1968.

James F. McClure, Jr., McClure & McClure, Lewisburg, Pa., for appellants.

Harry A. Nagle, Asst. U. S. Atty., Lewisburg Pa. (Bernard J. Brown, U. S. Atty., Scranton, Pa., on the brief), for appellees.

Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

Appellant, James X. C. Long, a Black Muslim inmate of the United States Penitentiary at Lewisburg, Pennsylvania, brought suit invoking, among other grounds, jurisdiction under the Civil Rights Act, 42 U.S.C. § 1983 seeking to enjoin the Prison Warden from unconstitutionally interfering with his right of religious freedom and from discriminating against him because of his religious beliefs. The United States District Court for the Middle District of Pennsylvania, accepting the suit as a civil rights action under 42 U.S.C. § 1983, dismissed the complaint without a hearing stating that all of the issues raised in the complaint had been decided previously in its case, Desmond v. Blackwell.[1] On appeal this court affirmed the judgment of the District Court.[2] On application to the United States Supreme Court it granted leave to proceed in forma pauperis and certiorari, ordering the judgment vacated and the case remanded for further proceedings.[3] Counsel was then appointed and the appeal proceeded here under No. 15981.

Meanwhile appellant had brought another action seeking a writ of habeas corpus in the same District Court against the Attorney General of the United States[4] and the Warden of Lewisburg Penitentiary, again alleging unconstitutional interference with religious freedom and discrimination because of religious beliefs. Several other Black Muslim inmates were granted leave to join as parties plaintiff. The District Court, treating the action as one in the nature of mandamus, under 28 U.S.C. § 1361, granted summary judgment for the defendants.[5] An appeal was also taken from this judgment under No. 16159. By order of this court the appeals were consolidated and it is in this posture that they are now here considered.

Under No. 16159, as heretofore indicated, appellants sought a writ of habeas corpus. Traditionally, the writ of habeas corpus has functioned to test the legality of confinement rather than the manner in which the detention is administered.[6] Thus habeas corpus is not a proper proceeding to investigate complaints by prisoners of mistreatment since such complaints do not attack the legality of the confinement.[7] The District Court, apparently recognizing these

1. 235 F.Supp. 246 (M.D.Pa.1964).

2. Long v. Blackwell, 351 F.2d 950 (3 Cir. 1965).

3. Sub nom. Long v. Parker, 384 U.S. 32, 86 S.Ct. 1285, 16 L.Ed.2d 333 (1966).

4. The complaint named Attorney General Nicholas Katzenbach as defendant. He has been succeeded by Attorney General Ramsey Clark. An appropriate order of substitution has been filed.

5. Long v. Katzenbach, 258 F.Supp. 89 (M.D.Pa.1966). The main thrust of the complaint in this case related to the use of religious lists by the prison authorities whereby an inmate, at the commencement of his incarceration, was placed on a list according to his professed religion. The complaint challenged the authority of the prison officials to prevent an inmate from attending the services of a religion on whose list he had not been named, thereby preventing the conversion of an inmate from one religion to another. Subsequent to the District Court's determination, a statement was issued by the Lewisburg Penitentiary officials which relaxed the religious list regulations. On this appeal appellants did not press their claim that the prison officials used these lists to perpetrate religious discrimination.

6. Roberts v. Pegelow, 313 F.2d 548 (4 Cir. 1963); Haskins v. United States, 292 F.2d 265 (4 Cir. 1961); Williams v. Steele, 194 F.2d 32 (8 Cir.), rehearing denied, 194 F.2d 917 (8 Cir.), cert. denied, 344 U.S. 822, 73 S.Ct. 20, 97 L.Ed. 640 (1952). See generally Note, 20 Rutgers L.Rev. 528, 562 (1966).

7. United States ex rel. Knight v. Ragen, 337 F.2d 425 (7 Cir. 1964), cert. denied, 380 U.S. 985, 85 S.Ct. 1355, 14 L.Ed.2d 277 (1965); United States v. Kniess, 251 F.2d 669 (7 Cir. 1958); Williams v. Steele, supra note 6; United States ex rel. Morrison v. Myers, 174 F.Supp. 818 (E.D.Pa.1959). But see Coffin v. Rei-

limitations of its habeas corpus jurisdiction, treated this complaint as one in the nature of mandamus with jurisdiction attaching by virtue of 28 U.S.C. § 1361.[8] In so construing this complaint, and thereby giving a proper remedy to appellants, untutored in legal niceties, the District Court properly exercised its discretion.[9]

In considering appellant's suit at No. 15981 under 42 U.S.C. § 1983,[10] the District Court misconceived the remedy. Appellant, a federal prisoner, sought to enjoin the allegedly discriminatory administration of a United States Penitentiary by a federal official. Since section 1983 grants a cause of action against those acting under color of state law and not those acting under color of federal law, relief could not be predicated on this section.[11] Jurisdiction should be regarded as invoked again under section 1361.

Since these homespun complaints by prison inmates lack the technical clarity of normal pleadings, this court has, of course, given them a reasonably liberal reading. Although the specific allegations of religious discrimination are not always repeated in each complaint, for purposes of this appeal, the court has considered the two complaints as if they were one.

Appellants all profess to be members of the Black Muslim movement, an alleged sect of the religion of Islam, founded in 1930 and headed by one, Elijah Muhammad.[12] The Black Muslims claim many attributes commonly associated with the major religions and several courts have recognized the movement as a religion.[13] However, the sect cannot be classified as purely religious in nature.[14] Basic to the Black Muslim faith is the inexorable hatred of all

---

chard, 143 F.2d 443, 155 A.L.R. 143 (6 Cir. 1944).

8. 28 U.S.C. § 1361.
"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

9. Walker v. Blackwell, 360 F.2d 66 (5 Cir. 1966).

10. 42 U.S.C. § 1983.
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

11. Walker v. Blackwell, supra note 9; Johnson v. District of S. Mo. Comm'rs, 258 F.Supp. 669 (W.D.Mo.), aff'd, 368 F.2d 184 (8 Cir. 1966).

12. Lincoln, "The Black Muslims in America." (1961).

13. See, e.g., Sostre v. McGinnes, 334 F.2d 906 (2 Cir.), cert. denied, 379 U.S. 892,

85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Sa-Marion v. McGinnes, 253 F.Supp. 738 (W.D.N.Y.1964); Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964); Fulwood v. Clemmer, 206 F.Supp. 370 (D.D.C.1962); State ex rel. Tate v. Cubbage, 210 A.2d 555 (Del.Super.Ct.1965).

14. Cooper v. Pate, 382 F.2d 518 (7 Cir. 1967); Sostre v. McGinnes, supra note 13, at 908–909. One commentator has stated:
"[T]he group cannot be classified as purely religious in nature: 'Although the Black Muslims call their Movement a religion, religious values are of secondary importance. They are not part of the Movement's basic appeal except to the extent that they foster and strengthen the sense of group solidarity.' [Lincoln, The Black Muslims in America 27 (1961).] The central doctrine of the movement is black supremacy and the equation of the white race with 'total evil.' [Worthy, The Angriest Negroes, Esquire, Feb. 1961, p. 102.] The Black Muslim's exact political aspirations are nebulous, although vague statements have been made concerning the establishment of a separate Black Muslim state in America, estimated to include from one to ten of the present states. How this territory is proposed to be acquired is a matter of mystery. There is within the move-

white people.[15] Also basic to the doctrine of the Black Muslims is belief in the racial superiority of the black race, the demand for racial segregation of the white and black races, and the belief that the United States owes the Black Muslims a state of their own.[16] Appellees, however, do not here contest the legitimacy of treating the Black Muslim beliefs as a religion, and therefore, it will be assumed the appellants are entitled to avail themselves of the protections afforded by the First Amendment.

■ Drawing on this assumption it follows that the members of the Black Muslim faith have an absolute right to embrace their religious beliefs, and to be free from discrimination because of their adherence to those beliefs.[17] While it is clear that these rights are not lost to those who are committed to prison, it is also clear that within the prison society as well as without, the practice of religious beliefs is subject to reasonable regulations, necessary for the protection and welfare of the community involved.[18]

■ The power of promulgating regulations necessary for the safety of the prison population and the public as well as for the maintenance and proper functioning of the institution is vested in correction officials with expertise in the field and not in the courts. There can be no question that they must be granted wide discretion in the exercise of such authority. Where, however, the charge is made that the regulations imposed by prison authorities restricting religious practices fall more harshly on adherents of one faith than another, the courts will scrutinize the reasonableness of such regulations.[19]

Appellants here contended that they are being discriminated against in that they are not provided with a fair proportionate share of government funds and facilities available for religious purposes within the prison. On this appeal they specifically charge that this discrimination is manifested in (a) the restriction on the Black Muslims' use of the prison chapel and (b) the refusal (1) to provide an adequate and acceptable version of their holy book, the Quran; (2) to provide them with religious medals; (3) to enter into contractual arrangements with Black Muslim ministers to teach them and attend their religious needs and (4) to make special dietary provisions for them.

In answering, the appellees, in case No. 15981, simply relied on the disposition by the District Court in *Desmond*.[20] And in case No. 16159, the appellees denied any discriminatory treatment with regard to the use of the prison chapel, claiming that it was designated for the religious services of those sects such as the Catholics and Protestants which had large followings, while smaller sects such as that of the appellants were permitted special quarters because of limited time, space and supervision considerations.

ment an elite army, called the Fruit of Islam, whose activities have been shrouded in secrecy."
Comment, 75 Harv.L.Rev. 837, 838–39 (1962).

15. See "The Supreme Wisdom," by Elijah Muhammad as quoted in Sostre v. McGinnes, supra note 13, at 909. See also Cooke v. Tramburg, 43 N.J. 514, 520, 205 A.2d 889, 12 A.L.R.3d 1269 (1964).

16. See generally Comment, 62 Colum.L. Rev. 1488 (1962); Comment, 75 Harv.L. Rev. 837 (1962); Note, 20 Rutgers L. Rev. 528 (1966).

17. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); Cantwell v. State of Connecticut, 310

U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Cooper v. Pate, supra note 14; State ex rel. Tate v. Cubbage, supra note 13.

18. Cantwell v. Connecticut, supra note 17; Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878); Cooper v. Pate, supra note 14; Evans v. Ciccone, 377 F. 2d 4 (8 Cir. 1967); Banks v. Havener, supra note 13; Cooke v. Tramburg, supra note 15.

19. See, e.g., Cooper v. Pate, supra note 14.

20. 235 F.Supp. 246 (M.D.Pa.1964). It should be noted that the District Court in this case made no reference to the charge of discrimination in the use of the chapel.

In reply to the refusal to enter into contractual arrangements with Black Musim ministers the appellees, in case No. 16159, averred that no request had been made for the appointment of a Black Muslim chaplain and while provision is made for Catholic and Protestant chaplains as part of the staff of the institution, the appointment of chaplains for each of the numerous other religious sects and denominations having small followings would be impossible under conditions existing in a maximum security prison.[21]

The District Court relied solely on its decision in *Desmond*[22] in dismissing the complaint in No. 15981. It is true that some similar issues were put forward in both this complaint and in *Desmond*, but appellant Long was not named as a party in *Desmond* so that case cannot be regarded as res judicata here.[23] Nor can *Desmond* be regarded as controlling on the fact issues here, since the passage of time between the cases left room for disparate circumstances.[24]

In No. 16159, the District Court addressed itself only to the alleged discriminatory treatment in the use of the chapel, and the failure of the prison officials to provide ministers for the Black Muslim inmates. In each of these instances, the District Court ruled that there was no deprivation of religious rights and no discriminatory treatment. Furthermore, it ruled that the regulations enforced by the prison authorities were within the administrative discretion of the institution, that the exercise of that discretion was not arbitrary nor capricious and therefore it would be improper for the court to interfere. For these reasons, the District Court, concluding that no hearing was necessary because no genuine issue of material fact had been presented, granted appellees' motions for summary judgment.

The District Court recognized that on a motion for summary judgment the burden is on the moving party; that matters presented must be construed most favorably to the party opposing the motion, and that it is well settled that such a motion will not lie where there is a genuine issue as to a material fact. However, it apparently accepted as true the allegations of the appellees. In this the District Court erred for the facts alleged by appellants were highly contradicted by the appellees and therefore raised issues for the court's determination only after a hearing. At such a hearing opportunity should be afforded the parties to offer evidence as to whether the appellants are discriminatingly excluded from the use of the prison chapel and whether the failure to provide a minister or ministers of appellants' persuasion also constitutes discrimination. Additionally, opportunity should be afforded for the submission of evidence by the parties on the other issues, namely, whether the appellants suffered discrimination in the refusal to provide an adequate and acceptable version of their holy book, the Quran; the refusal to provide them with religious medals; and the refusal to accommodate their special dietary needs. From such evidence will flow findings of fact by which the District Court will determine whether these appellants have been accorded the equal treatment to which they are entitled under the First and Fifth Amendments of the Constitution.

There remains one other issue. In the respective complaints appellants allege

---

21. No formal replies appear in appellees' answering pleadings to appellants' other charges of discriminatory treatment.

22. 235 F.Supp. 246 (M.D.Pa.1964).

23. See 1B Moore, Federal Practice, ¶ 0.405 [1–3] (2d ed. 1965).

24. Since the disposition of *Desmond*, e.g., on April 6, 1966, Policy Memorandum No. 7300.4 entitled "Religious Beliefs and Practices of Inmates" was issued by the Director of the Bureau of Prisons. Pursuant to that memorandum, the Lewisburg Penitentiary issued on August 4, 1966 Policy Statement No. NE 7300.4 dealing with the religious beliefs and practices of inmates of the Black Muslim faith. Cognizance was taken by the District Court of these regulations in its memorandum of August 16, 1966.

that they have been unconstitutionally denied the right to receive and read authoritative publications of their religious sect, including the weekly newspaper "Muhammad Speaks." Appellees justify the refusal to permit this newspaper to be received on the grounds that it is "highly inflammatory." Without a hearing to determine the religious significance of this newspaper or the nature of its contents the District Court sanctioned this standard of censorship. It stated: "The plaintiffs complain they cannot receive the weekly newspaper, 'Muhammad Speaks.' This is highly inflammatory material and any such refusal is justified." [25] In so ruling the District Court misconceived the standard which is applicable to the prohibition of such literature.

■ Mere antipathy caused by statements derogatory of, and offensive to the white race is not sufficient to justify the suppression of religious literature even in a prison. Nor does the mere speculation that such statements may ignite racial or religious riots in a penal institution warrant their proscription. To justify the prohibition of religious literature, the prison officials must prove that the literature creates a clear and present danger of a breach of prison security or discipline or some other substantial interference with the orderly functioning of the institution.[26]

■ Again opportunity should be afforded the appellants to establish that the newspaper, "Muhammad Speaks" is basic religious literature essential to their belief in and understanding of their religion. Also whether the receipt of literature of similar relevance is permitted prisoners of other faiths. Once such proofs are adduced the "clear and present danger" tests above described must be met by the appellees.

No intimation is made that all or any of the acts of which appellants complain constitute grounds for the relief sought. It is sufficient for present purposes to hold that the complaints stated enough to warrant a hearing.

For the foregoing reasons the order of the United States District Court for the Middle District of Pennsylvania of April 22, 1965 in Long v. Blackwell (Appeal No. 15981) will be vacated. The order of that Court of July 22, 1966 in Long v. Katzenbach (Appeal No. 16159) will also be vacated except as to that portion applying to Bobbie L. X. Colter, whose complaint was later ordered dismissed and from which no appeal was taken. The cases will be remanded for further proceedings consistent with this opinion.

GERALD McLAUGHLIN, Circuit Judge (dissenting).

The Black Muslim sect is itself comparatively new and its appreciable increase in membership very recent. There was admittedly no problem regarding Black Muslims until that increase. Thereafter the Bureau of Prisons, functioning under the Attorney General of the United States, took prompt and continuous measures to reasonably supply Black Muslim sect needs in federal prisons. Appellants themselves plainly state their objective in these cases as follows:

"The primary concern of petitioners is that they be treated on an equal basis with respect to their religious beliefs and practices as all other inmates of the penitentiary."

The Bureau of Prisons policy statement for Lewisburg dated August 4, 1966, with respect to the Islamic Black Muslim Faith said:

"Until the present time, there has not been a sufficient number of followers of the Islamic-Black Muslim Faith to warrant holding formal worship services under the guidance of a Minister of this faith. Inmate con-

---

**25.** Long v. Katzenbach, 258 F.Supp. 89, 93 (M.D.Pa.1966). The "inflammatory" standard was also applied by the District Court in its decisions in Desmond v. Blackwell, 235 F.Supp. 246 (M.D.Pa. 1964) and Fulwood v. Alexander, 267 F. Supp. 92 (M.D.Pa.1967).

**26.** Banks v. Havener, 234 F.Supp. 27 (E.D. Va.1964).

ducted meetings have been authorized in the past several years for participants of this faith. However, due to the increasing number of new commitments affiliated with this faith, and in light of the above mentioned Bureau Policy Memorandum allowing for changes in religious affiliation, it is appropriate that the special needs of this Islamic-Black Muslim faith be recognized and coordinated into the religious activities of the institution."

It went on to say that efforts were being made to obtain regular services of a Muslim minister. Meanwhile it comprehended services being conducted by inmates. It called for adequate meeting facilities. It reiterated that an inmate was allowed to change the record of his religious affiliation. It provided mechanics for correspondence with the heads of religious bodies and for reception of radio religious programs. It stated that efforts were being made to secure religious medals for respective groups. Paper bound volumes of the Quran (Penquin Edition) costing about $1.50 a book were purchased and distributed to Muslim inmates. Paper bound volumes of the Bible purchased and distributed to inmates cost about $1.00 a volume. Requests for ornate, hard covered Qurans had to be denied for economic reasons.

This in reality leaves actually one disputed item. A weekly paper called "Muhammad Speaks" is not allowed in Lewisburg by the Director of Prisons. The majority opinion talks of its "statements derogatory of, and offensive to the white race * * *." Such a situation and its causes are not pleasant but can and will be remedied as time goes on. I would think that its destruction of the white race theme is a far more dangerous doctrine. In any event, here the court relies on the opinion in Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964) in holding that the prison officials must prove judicially that "Muhammad Speaks", "creates a clear and present danger of a breach of prison security or discipline, etc." before prohibiting it. And appellants claim that in Banks "It was specifically held that all inmates of the District of Columbia Youth Center at Lorton, Virginia may subscribe to Muhammad Speaks if they so desire". The Banks case concerned the stoppage by the Director of the District of Columbia, Department of Correction, of organized Muslim meetings at the Center because of a riot during the period. The court found there was no legal justification for blaming the riot on the Muslims and followed with its order allowing the Muslims to practice their religion without discrimination. It was some time after the riot that the Director allowed the publication, "Muhammad Speaks", in the institution, together with permission to hold small informal Muslim meetings and making available a copy of the "Koran". All those were administrative matters and so processed. The Banks opinion outlined them at length and in effect unmistakably approved of them.

These appellants, all Black Muslims, have been, should be, must be treated on an equal basis with all other inmates of Lewisburg. And in common fairness, appellees should be accorded a little bit of that justice. The Muslim prison condition was properly taken care of as soon as it appeared. As has been seen the sect now functions as part of the ordinary religious life of such federal institutions. Distribution of the particular paper is an administrative problem, depending to some extent at least on the particular prison, its inmates and local conditions. It offers no valid excuse for interference in this instance and for remitting these cases for a hearing, involving all the collateral ill effects which will accompany it.

I would affirm the judgment of the District Court.