**Robert F. URBANO, No. 37744,**
**Plaintiff,**

v.

**Lloyd W. McCORKLE, Commissioner of Institutions and Agencies of the State of New Jersey, et al., Defendants.**

**Civ. A. No. 1186–68.**

· United States District Court,
D. New Jersey.

Nov. 17, 1971.

Purvis Brearley, Trenton, N. J., for plaintiff.

Brown, Connery, Kulp, Wille, Purnell & Greene by William J. Cook, Camden, N. J., for defendants.

## MEMORANDUM OPINION

## PARTIAL SUMMARY JUDGMENT

KITCHEN, District Judge:

Robert F. Urbano, an inmate of the New Jersey State Prison System serving a life sentence for murder and current-ly confined in general population at Leesburg Prison Farm instituted this prisoner complaint action in the United States District Court on November 8, 1968. Urbano brings this action against eleven officers of the New Jersey Department of Institutions and Agencies, alleging violations of certain constitutional and civil rights. Jurisdiction is based upon diversity of citizenship and the Civil Rights Act. Since it is not precisely clear what issues plaintiff is attempting to raise by his amended complaint, filed December 21, 1968, the issues stated by plaintiff in his "Brief in Opposition to Defendants' Second Motion for Summary Judgment" [hereinafter cited as *Brief*] shall be those considered, to the extent that they bear some relation to the facts alleged in the amended complaint.

Defendants have moved for a partial or complete summary judgment.[1] A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. F.R.Civ.P. 56 (c).

■ I. Plaintiff's first issue is: "whether defendants' actions, either individually or severally, since 10/22/68, i. e. transfer to State Hospital and confinement in punitive segregation, were maliciously intended in order to deny, impair or discourage *in futuro* plaintiff's constitutional rights, such as access to the courts, and in order to punish plaintiff for past legal action on behalf of himself and other prisoners, such as a 1965 legislative investigation of defendants' prison administrations?"

*Brief* at 1.

Plaintiff does not dispute that defendants may transfer prisoners among state institutions for a proper purpose. *Id.* The gist of this issue is whether the

---

1. Oral arguments were heard by this Court on October 1, 1971, at which time counsel were directed to submit proposed findings of fact and conclusions of law.

transfers were designed to produce a "chilling effect" on plaintiff's constitutional right of access to the courts.[2]

The facts viewed in the light most favorable to the responding party are these. On the morning of October 20, 1968, only a few inmates reported for breakfast at the prison messhall. Apparently, a rumor had been circulated that the food served that day would be contaminated with human waste. Defendant prison officials interviewed various inmates to attempt to ascertain the cause of the boycott. Included among these prisoners was plaintiff Urbano. The next day, October 21, 1968, prison officials directed four prisoners, including plaintiff, to attend a meeting at which the causes of the boycott were discussed. Plaintiff "reiterated his prior complaints," among which were poor preparation and inadequate portions of food, lack of outdoor recreation in the winter, discrimination against blacks, homosexual prison officials and lack of a prisoner-administration liaison committee. Later that afternoon, defendants again met with certain inmates and announced that a number of their complaints would be rectified.

Rumors, however, persisted the next day, October 22, 1968, that prison officials were not going to act on any of the prisoner complaints, and that in retaliation, all inmates were to take part in disturbances planned for October 28, 1968. Plaintiff and three other inmates were again directed to meet with prison officials, who informed plaintiff that he had been pinpointed by various inmates as the alleged leader of the planned prison disturbances. Plaintiff denied these allegations. Another meeting was held by prison officials, at which time they agreed that certain inmates were a threat to the safety and welfare of the institution and that these prisoners should be transferred to other institutions within the state prison system. That night, at approximately 11:00 P.M., plaintiff and 32 other prisoners were transferred from Trenton State Prison. Of these, approximately 19, including Urbano, were transferred to the Prison Hospital. The transfer was authorized by Commissioner McCorkle pursuant to N.J.Rev.Stat. 30:4–85, which states in part:

> "Any inmate of any correctional institution * * * may be transferred to any other such correctional institution by order of the commissioner * * *."

■ The transfer of a state prisoner from one state prison to another does not violate any of the prisoner's constitutional rights. United States ex rel. Stuart v. Yeager, 293 F.Supp. 1079 (D.N.J. 1968), aff'd, 419 F.2d 126 (3rd Cir.), cert. denied, 397 U.S. 1055, 90 S.Ct. 1400, 25 L.Ed.2d 673 (1969). Plaintiff contends that this transfer was designed to prevent him from having access to the courts. Yet, plaintiff admits that he was represented by counsel at this time, and on October 23 at 3:00 P.M., approximately 16 hours after the transfer, he was allowed a visit with his attorney at which time they "exchanged papers." Affidavit of Robert F. Urbano, April 16, 1969 at ¶ 13 [hereinafter cited as Affidavit]. This court finds that there is no merit to the allegation that prison officials intended to deny plaintiff access to the courts, when by his own admissions, he has been and still is represented by able counsel and was allowed contact with his attorney in a very reasonable time after the transfer.

Urbano alleges that as of the date of filing this action, defendants had retained certain legal files belonging to plaintiff. These files were taken into custody on October 22, 1968, the date that plaintiff was transferred to the prison hospital. On November 11, 1968, plaintiff was transferred to the segregation unit at the prison farm in Rahway.

---

2. Since plaintiff only specifically alleges denial of access to the courts, this issue should not be extended to include denial of other constitutional rights. See Ash-wander v. Tennessee Valley Authority, 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1935) (Brandeis, J., concurring).

Plaintiff admits, however, that on November 19, 1968, two files were returned to him, one being his file in this lawsuit. The next day, plaintiff was suddenly hospitalized but was allowed to keep his files until November 28, 1968, at which time they were taken from him. The confiscation was authorized by a prison hospital rule that forbids prisoners from using legal volumes, typewriters, etc. while in the hospital. Upon discharge from the hospital on January 20, 1969, Urbano was returned to Trenton State Prison and placed in segregation. Plaintiff claims that he had trouble in obtaining the return of his personal legal material while in "punitive" segregation. But it should be noted that plaintiff's legal material consisted of nearly 300 law reporters plus numerous other treatises and compilations of statutes. Plaintiff also admits that on workdays, he had access to his personal legal material, which was brought to him by guards, and on weekends, he had access to the prison law library. Not only did plaintiff have reasonable access to his legal materials, but also independent counsel had been representing him at the time of these transfers. The documents filed by plaintiff do not indicate that he was denied in any arbitrary or unreasonable manner the opportunity to consult his material or to confer with counsel.

Finally, Urbano's record of litigation speaks for itself. In the past decade, he has filed suit in at least 17 actions. Some of these suits have reached the Third Circuit Court of Appeals and the United States Supreme Court. Indeed, the documents filed by plaintiff in the present suit are voluminous, indicating that the prison authorities have not changed their position with regard to allowing Urbano the uninhibited access to the courts that he has enjoyed since incarceration. In Wilson v. Prasse, 404 F.2d 1380, 1381 (3rd Cir. 1968), the court stated:

"Insofar as appellant complains of alleged denial of his right of access to the courts, the record shows that the many civil actions instituted by appellant in the federal and state courts supported the conclusion of the District Court that the contention that appellant had been denied access to the courts was frivolous."

There can be no material dispute concerning plaintiff's record of litigation. In view of the fact that plaintiff is represented by able counsel and that plaintiff admits that he has had and still is allowed access to his legal material and the prison law library, it is the opinion of this court that plaintiff has not stated facts sufficient to support his conclusory statement that he was unreasonably denied access to the courts. *See* Negrich v. Hohn, 379 F.2d 213 (3rd Cir. 1967). Accordingly, defendant's motion for summary judgment on this issue is granted. *Accord,* Conway v. Oliver, 429 F.2d 1307 (9th Cir. 1970).

■ II. Plaintiff's second issue is: "whether defendants deliberately framed plaintiff by coercing him into a position of prominence in real or alleged prison disturbances and whether defendants exaggerated any real disturbance in order to 'excuse' denial of plaintiff's constitutional rights by incarcerating plaintiff in punitive segregation and in order to discourage plaintiff and other prisoners from filing future legal actions against the administration?"

*Brief* at 1.

In his amended complaint, Urbano stated that upon conferring with prison officials about the causes of the disturbance at Trenton Prison, he "advised unequivocally that he does not represent any other prisoner than himself." Amended complaint at ¶ 5. Urbano further states in his amended complaint that "plaintiff advised that he did not, could not, and would not represent anyone but himself," and "plaintiff emphasized that he represented no one but himself." *Id.* at ¶ 7. Yet, his complaint and supporting affidavits are replete with instances in which plaintiff advocates the cause of other inmates. For example, plaintiff complains of discrimination against Negroes, homosexual ad-

vances by certain member of the prison administration to the younger prisoners, *id.*, and deprivation of other prisoners' constitutional rights, *id.* at ¶ 16. Plaintiff also admits that he had filed suit previously on behalf of himself and other prisoners to abolish a ten dollar "special savings account" per prisoner, used in lieu of discharge funds. *Affidavit* at ¶ 6. Plaintiff later complains about the treatment given three other inmates at the Trenton Prison Hospital, *id.* at ¶ 15, and the "improper" transfer of four inmates to Rahway, *id.* at ¶ 16. Urbano also admits that he has counselled other prisoners, *see id.* at ¶ 19 and that because of his "superior education," his "integrity" is respected by the average prisoner and many such inmates are referred to him for counselling. Amended complaint at ¶ 5. The above examples are merely illustrative of the numerous other occasions cited by plaintiff in which he represented the causes of other inmates, both to prison officials and to this court in the present action. By his own admissions, plaintiff is in a "position of prominence" in the hierarchy of inmates and this court fails to see any merit in the allegation that plaintiff Urbano was "framed" so that his rights could be "excused." The exact legal issue presented by plaintiff through counsel on this point is not clear. It is the opinion of this court, however, that plaintiff would not be entitled to relief under any state of facts that could be proved in support of his claim. *See* Scher v. Board of Education, 424 F.2d 741, 744 (3rd Cir. 1970). Accordingly, summary judgment of this "issue" is granted.

■ III. In plaintiff's *Brief* at 2, it is set forth:

"*The issue is* whether plaintiff was entitled to minimal due process or administrative procedure in order to defend himself against any charges either prior to or while in segregation?"

In his amended complaint at ¶ 12, Urbano stated:

"On November 11, 1968, plaintiff and five others were transferred from State Hospital to administrative segregation at the New Jersey State Prison Farm at Rahway. *None of the six has been given any hearing or advised of any charges or reason for punitive segregation.*" (Emphasis added).

Defendant Yeager, the Principal Keeper of the New Jersey State Prison, stated in his affidavit of May 15, 1969, that:

"The allegation is false. As indicated previously, the New Jersey State Prison has no 'punitive' segregation. Plaintiff is not in segregation because of any disciplinary charge against him, but is there for the order of the institution in the opinion of the administrative authorities of the State Prison. *If he had been charged with a disciplinary infraction then he would have received a hearing.*"

*Id.* at ¶ 17 (Emphasis added).

According to this statement, an inmate of the general population may be placed in "administrative" or as Urbano prefers, "punitive" segregation merely by fiat if he is *not charged* with an infraction of the rules. This would circumvent the requirement of a hearing that exists for cases in which a prisoner *is charged* with a violation.[3] Consequently, prison officials may segregate any inmate without a hearing merely by stating that it is being done "for the order of the institution in the opinion of the administrative authorities of the State Prison."

■ This court is aware that the Third Circuit has stated:

"The power of promulgating regulations necessary for the safety of the prison population and the public as well as for the maintenance and proper functioning of the institution is vested in correction officials with expertise

---

3. A hearing is not required by New Jersey statute. The legislature has delegated the authority to make rules and regula-tions governing the administration of correctional institutions to the Commissioner. N.J.Rev.Stat. 30:4–91.6.

in the field and not in the courts. There can be no question that they must be granted wide discretion in the exercise of such authority."

Long v. Parker, 390 F.2d 816, 820 (3rd Cir. 1968). But we are equally aware that such discretion is not absolute. *See* Gittlemacker v. Prasse, 428 F.2d 1, 4 (3rd Cir. 1970); Long v. Parker, *supra*, 390 F.2d at 820; Knuckles v. Prasse, 302 F.Supp. 1036, 1048 (E.D.Pa. 1969), *aff'd*, 435 F.2d 1255 (3rd Cir. 1970), *cert. denied*, 403 U.S. 936, 91 S.Ct. 2262, 29 L. Ed.2d 717 (1971). In "instances [when] * * * state regulations applicable to inmates of prison facilities conflict with [federal constitutional] rights the regulations may be invalidated." Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1968). This Circuit has stated:

> "To determine, with precision, those rights which follow an inmate into prison involves a process of weighing and balancing conflicting interests."

Gittlemacker v. Prasse, *supra* at 4. Even though "those rights which survive penal confinement may be diluted by peculiar institutional requirements of discipline, safety, and security," *id.* at 4, the balancing test suggested by *Gittlemacker* would indicate that there are occasions when the scales would weigh more heavily in favor of the constitutional right to be protected. This is not to say that all prisoners are fully protected by constitutional rights to the extent enjoyed by free citizens. This court is merely stating that a prisoner does not leave all his constitutional rights at the prison door. ▮▮▮ Prisoners are protected, at least minimally, by the Fourteenth Amendment's due process and equal protection clauses. Knuckles v. Prasse, *supra*, 302 F.Supp. at 1048, *quoting with approval*, Washington v. Lee, 263 F.Supp. 327, 331 (M.D.Ala. 1966), *aff'd per curiam*, 390 U.S. 333, 88 S.Ct. 994, 19 L.

Ed.2d 1212 (1967). The rule of due process is one of fairness under the circumstances of the given case. Grausam v. Murphey, 448 F.2d 197 (3rd Cir. 1971). Therefore, to determine the exact extent of due process protection, the various considerations must be balanced.

On one hand, an inmate is given a prison sentence only after a full, fair and impartial trial and a study of the presentence report. The sentencing judge is subject to appellate review. The prison sentence that is imposed is a term of years, regulated by statute, to the general population of the penal institution. To have prison officials arbitrarily and capriciously impose a harsher penalty *ex parte* would be to substantially negate the safeguards that are built into the judicial sentencing process.[4]

On the other hand, reasonable discipline is inherent in the administration of a penal institution. Prison officials may have need, in times of emergency, to segregate inmates for the good of the prison community. In view of the riotous situations that may develop without keen foresight on the part of prison officials and the ability to act accordingly in swift fashion, it cannot be said that all of the formal requirements of due process that are afforded to the free citizen will necessarily carry over into the prison.

This very problem was presented recently in Sostre v. Rockefeller, 312 F. Supp. 863 (S.D.N.Y.1970), *rev'd in part, modified in part, aff'd in part sub nom.*, Sostre v. McGinnis, 442 F.2d 178 (2d Cir.), *petition for cert. filed*, 40 U.S. L.W. 3080 (U.S. Aug. 18, 1971) (No. 71–246). In the district court's opinion, Judge Motley held that:

> "Before plaintiff could have been constitutionally 'sentenced' to punitive segregation, he was entitled to: 1) written notice of the charges against him (in advance of a hearing) which

---

4. *See* Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968), wherein it was stated, "if a prisoner is serving time to 'pay his debts to society,' any further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny."

designated the prison rule violated; 2) a hearing before an impartial official at which he had the right to cross-examine his accusers and call witnesses in rebuttal; 3) a written record of the hearing, decision, reasons therefor and evidence relied upon; and 4) retain counsel or a counsel substitute."

312 F.Supp. at 872.

The imposition of these formal due process requirements was rejected by the Second Circuit. But the court stated, "We do not doubt that Sostre was entitled to 'due process of the law' before he was punished for an infraction of prison rules." 442 F.2d at 196. The court found the difficult problem to be the extent of due process protection.[5] The Second Circuit stated:

"[O]ur constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases, it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him * * * and afforded a reasonable opportunity to explain his actions."

*Id.* at 198.

Individuals whose rights are affected directly through actions of state officials should be protected by due process to the extent that the rights of the individuals and interests of the government are balanced. This court is of the opinion that prisoners who are confined to administrative segregation for the good of the institution should be entitled to the same minimal due process that is already afforded prisoners who are confined to segregation for disciplinary infractions. Equal protection so requires. Minimal due process in this situation does not mean that a formal hearing or the right to counsel is a requirement. But it does mean that before a prisoner is removed from the general population of an institution and placed in segregation, he should be notified in writing of the charges and nature of the evidence against him and be given a reasonable opportunity to explain away the accusation.[6] We are also of the opinion that in times of emergency situations, such process may be postponed and emergency action taken. But the prisoners affected should thereafter be afforded within a reasonable time the minimal due process that is stated above. For the above reasons, defendants' motion for summary judgment on this issue is denied at this time.

IV. Related to the issue of the due process are plaintiff's issues 5 and 7, namely:

5. *"The issue is* what damages, compensatory and/or punitive, is plaintiff entitled to for the direct or indirect results of defendants' malicious and unlawful actions in segregating and harassing plaintiff?"

and

7. *"The issue is* whether plaintiff is entitled to work credits lost through defendants' malice and illegal action and whether the alleged disciplinary charges and confinement in segregation should be expunged from the rec-

---

5. Other district courts have agreed with Judge Motley concerning the extent of procedural due process. *See* Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971).

6. *Accord*, Nolan v. Scafati, 306 F.Supp. 1, 3 (D.Mass. 1969), *vacated on other grounds*, 430 F.2d 548 (1st Cir. 1970). In United States *ex rel.* Keen v. Mazurk-

iewicz, 306 F.Supp. 483, 485 (E.D.Pa. 1968), it was indicated in dicta that there may be a reasonable basis for interfering with the actions of prison officials if confinement to segregation is for an arbitrary reason. In Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y. 1970), the court indicated that a prisoner must be found guilty of charge of misconduct before or within a reasonable time after commitment to solitary confinement.

ord and the parole authority instructed not to consider any of the instant matters in any way when plaintiff becomes eligible for parole?"

*Brief* at 4.

Plaintiff has based this court's jurisdiction, *inter alia*, upon 42 U.S.C. § 1983. This section allows the recovery of compensatory and punitive damages for deprivations of federally protected rights. In plaintiff's issue 5, two injuries are actually alleged. One is the "direct" injury, that is, the deprivation of the federally protected right; the other is the "indirect" injury, that is, any consequential damages that may flow from the deprivation of the federally protected right.

The direct injury is actionable *per se*. A deprivation of a federally protected right usually presents a case in which damages either in money or other remedies may be awarded. Compensatory money damages, especially in the instant case, may not necessarily make a plaintiff whole. As a result, courts have tried to redress plaintiffs' injuries by other awards, such as restoration of lost "good-time" credits. *See, e. g.*, Sostre v. McGinnis, *supra*, 442 F.2d at 204. In this case, Urbano does not allege that he lost good-time credits; instead, he claims to have lost an opportunity to earn "work-credits." [7] In addition, the allegedly illegal confinement to punitive segregation is said to have an adverse effect upon his chances for parole. Since the purpose of damages under this section is to place plaintiff in the same position, as far as possible, as he would have been had there been no breach of duty, *see* Lee v. Southern Homes Site Corp., 429 F.2d 290 (5th Cir. 1970), this court finds that such items may properly be made items of damages if Urbano can show that he otherwise would have earned work credits that were actually denied him in segregation and if such segregation in and of itself would have an adverse effect upon his chances for parole.

Urbano also alleges an "indirect" injury. The basis of this allegation is the beating he received by another prisoner while in segregation. But the test to determine whether one may recover for indirect injuries is whether the indirect injury was the natural consequence of the deprivation of the right. *See* Whirl v. Kern, 407 F.2d 781 (5th Cir.), *cert. denied*, 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969).

In his "Addendum to Statement of Uncontested Facts," Urbano states:

"[On May 19, 1970] [i]n the recreation yard * * * *without warning* Darby leapt under broken strands of barbed wire and onto the yard guard tower. While Darby was rummaging in the recreation equipment box, Officer Barnett rang the alarm bell sounding in the Control Center. The guard is without a weapon of any sort.

\*   \*   \*   \*   \*   \*

When Darby leapt to the ground again with a baseball bat—a regular recreation item for prisoners in segregation —Officer Barnett telephoned to the Control Center.

\*   \*   \*   \*   \*   \*

Darby immediately attacked plaintiff with the baseball bat and inflicted numerous painful injuries which rendered plaintiff unconscious. During the attack, Officer Barnett once more telephoned urgently to the Control Center."

In the instant case, plaintiff alleges a violation of his right to due process, more specifically, the right to a hearing before being placed in segregation. If Urbano were beaten because he did not have a hearing, the injury would be the natural conseqence of the deprivation of the federal right. But here, such is not the case. The attack could have occurred had Urbano been given a hearing or had both prisoners been in general population. The beating was an intentional intervening act by a third party. This court finds, as a matter of law, that there was no proxi-

---

7. An inmate may earn up to one day of work credit for every five days that he spends in a productive occupation. N.J. Rev.Stat. 30:4–92.

mate cause between the denial of the hearing and the beating that plaintiff allegedly suffered. Therefore, this will not be an item to be considered in determining damages, if any, under 42 U.S.C. § 1983. *Cf.* United States *ex rel.* Johnson v. Prasse, 450 F.2d 946 (3rd Cir. 1971).

■ Plaintiff's alternate grounds for jurisdiction is diversity of citizenship and amount in controversy. Accordingly, plaintiff is bringing a claim against defendant prison officials in tort for the above beating. The facts that Urbano alleges should be examined in light of New Jersey law on this particular subject. The only case known to this court that is reported in this area is Travis v. Pinto, 87 N.J.Super. 263, 208 A.2d 828 (L.Div.1965). In that case, inmate Travis reported to a guard that another prisoner had threatened him. Both inmates were placed in protective custody until an investigation could be made, after which plaintiff requested a release from protective custody. Later, as both inmates were attending a prison movie, the other prisoner attacked plaintiff with a razor blade. The court stated:

"From the evidence presented it clearly appears that Pinto as superintendent * * * and Van Zandt, his chief deputy, had duties which called for the exercise of considerable discretion. Van Zandt * * * moved swiftly to separate the prisoners before any physical assault was committed and then began his investigation to determine the potential of any harm to plaintiff. If physical assault had been made upon plaintiff before he was placed under * * * protective custody, the foreseeability of further harm to him might have required defendants to move with more caution. After a full investigation and an explanation to plaintiff, and his request to be released from protective custody, there came into play an exercise of discretion on the part of either defendant which his duties permitted him to exercise. No charge of malice or evil purpose is intimated on the part of

either or both defendants. The evidence indicates no right of action on the part of this plaintiff and, therefore, the motion for involuntary dismissal is granted.

*Id.* at 267–68, 208 A.2d at 831.

Thus, although arguably there are factual differences between *Travis* and the case at bar, the substance of the *Travis* holding is that the decision to allow prisoners to co-mingle is a matter that is left to the discretion of prison officials and that absent a charge of malice or evil purpose, a cause of action such as that presented here will not be sustained. Accordingly, summary judgment is granted to defendants on this issue.

■ This court now directs itself to the issue of punitive damages. Punitive damages should not be awarded in a § 1983 proceeding unless there is a showing that the proscribed action has been a constant pattern or practice of behavior of defendants and that such practice has been willful and in gross disregard for the rights of plaintiff. Even if the denial of a hearing has been the practice of prison officials, there is no evidence to show that this pattern was in willful disregard of plaintiff's constitutional rights such that punitive damages are warranted. *Accord, Lee v. Southern Homes Site Corp., supra,* 429 F.2d at 294. Furthermore, the award of punitive damages in this case would have little or no deterrent value.

Therefore, punitive damage cannot be an issue and defendants' summary judgment to this effect is granted.

■ V. Plaintiff's fifth argument states that:

"*The issue is* whether defendants have accorded plaintiff equal protection of law and whether defendants make a practice of denying prisoners equal protection of law, for example the practice of racial discrimination in the Trenton State Prison Education Department?"

*Brief* at 2. Since plaintiff has stated that he does not wish to represent others and since plaintiff is white and does not

have standing to raise the claims of blacks,[8] only alleged denials of Urbano's rights to equal protection shall be discussed.

In plaintiff's *Brief* at 2, he states "that other prisoners * * * were accorded privileges, particularly with regard to their legal matters, not accorded to plaintiff." The constitutional rights of state prisoners that survive penal confinement are protected by the Fourteenth Amendment's Equal Protection Clause. *See* Knuckles v. Prasse, *supra*. But Urbano does not allege that he was denied *rights* that are constitutionally protected and enjoyed by other prisoners. Instead, he alleges that he was not given *privileges* that were given to others. It is the opinion of this court that a claim by a prisoner that he was denied privileges will not sustain a claim that he was denied equal protection of the laws. The question of which *privileges* are to be afforded to prisoners is an issue that should be left to the discretion of prison officials. *See* Sullivan v. Ciccone, 311 F. Supp. 456, 458 (W.D.Mo. 1970); Ramsey v. Ciccone, 310 F.Supp. 600, 604 (W.D.

Mo. 1970). If this issue is read by the court as a denial of plaintiff's constitutional right of access to the courts, it has been decided *supra* that this claim is without merit. Therefore, defendants' motion for summary judgment on this ground is granted.

■ VI. Plaintiff next states that:
*"The issue is* whether defendants deliberately and maliciously attempted to deprive plaintiff of his constitutional right to counsel by prejudicing counsel against plaintiff and by making representation of plaintiff difficult or impossible, i. e. reading uncensored mail and eventually revocation of uncensored mail privileges enjoyed by other prisoners? "

*Brief* at 3–4.

In his *Affidavit* at ¶ 34, Urbano states:

"Mr. Brearley [Urbano's attorney] further advised * * * that defendant Edmonds had remarked in the presence of defendant Yeager to Mr. Brearley, 'you ought to see what Ur-

8. Ordinarily, only that person whose civil rights are interfered with has standing to sue for purported wrong in an action for violation of civil rights. Curtis v. Peerless Ins. Co., 299 F.Supp. 429 (D. Minn. 1969). Exceptions have been made. In Barrows v. Jackson, 346 U.S. 249, 257, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1952), the Court stated:
"Under the peculiar circumstances of this case, we believe the reasons which underlie our rule denying standing to raise another's rights, which is only a rule of practice, are outweighed by the need to protect the fundamental rights which would be denied by permitting the damages action to be maintained."
The Court noted that:
"The relation between the coercion exerted on respondent and her possible pecuniary loss thereby is so close to the purpose of the restrictive covenant, to violate the constitutional rights of those discriminated against, that respondent is the only effective adversary of the unworthy covenant in its last stand."
*Id.* at 259, 73 S.Ct. at 1036.

In Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969), the Court discussed the expulsion of Sullivan, a white, from a social club for his protest of the club's refusal to allow him to assign his membership share to Freeman, a black. The Court stated that:
"If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. * * * Under terms of our decision in *Barrows*, there can be no question but that Sullivan has standing to maintain this action."
*Id.* at 237, 90 S.Ct. at 404.
The present situation can be distinguished from *Barrows* and *Sullivan*. Here, plaintiff is not the only "effective adversary" to challenge racial discrimination. Assuming, *arguendo*, that there is discrimination against black inmates, plaintiff has not shown that sanctions have been imposed against him for advocating the cause of black inmates. Therefore, plaintiff lacks standing to raise this claim.

bano thinks of you in his letters to his mother.' My mother, Mrs. Flora C. Urbano of Williamstown, Massachusetts * * * had advised me of her suspicions that defendants were attempting to prejudice Mr. Brearley against me in order to deprive me of counsel. Therefore, I pretended dissatisfaction in my letters to her in the hope that defendants would expose themselves once more."

Plaintiff has admitted that he did express dissatisfaction with his attorney in his letters to his mother. Also, in plaintiff's *Brief* at 15, Urbano states "Plaintiff has never disputed defendants' right to censor prisoner's mail," and that "defendants are entitled to censorall [sic] prisoner's mail if they wish to do so," and that "plaintiff has never contended that he has an 'absolute federal right to unrestricted use of the mails.'" *Id.* at 16. This court fails to see upon which grounds plaintiff is stating a claim. Indeed, he has waived the issue of his right to use the mails without restriction; he has waived the claim that his letters to his mother were privileged; and he has implied that the remarks made by defendants to Brearley were apparently true. In light of these facts, defendants' motion for summary judgment on this issue is granted.

### SUMMARY

VII. Lastly, plaintiff states:

"In sum, *the issue is* whether prison administrators may with impunity arbitrarily and capriciously deny a prisoner's constitutional rights, including equal protection of law, access to courts without fear of retaliation, minimal due process and a hearing prior to substantial disciplinary proceedings, etc.?"

*Brief* at 4. These issues are merely repetitive of the issues that were raised and discussed in this opinion. This court's reasoning has been set forth and need not be repeated.

In summary, defendants are granted summary judgment on all issues except

the issue of whether plaintiff has been denied due process of law by not being given a hearing that satisfies the minimum procedural due process requirements set forth above.