Commonwealth *v.* Christina, Appellant.

Argued March 20, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, SPAULDING, CERCONE, and SPAETH, JJ.

*Cletus P. Lyman,* with him *Lyman & Ash,* for appellant.

*William R. Keller,* Assistant District Attorney, with him *Patrick J. Toole, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, September 19, 1973:
Order affirmed.

DISSENTING OPINION BY SPAETH, J.:

On August 7, 1972, appellant was sentenced on a conviction of burglary and larceny to serve two to four years in the county prison. On August 11, upon appellant's petition, the sentencing judge filed an order directing the warden of the prison to permit appellant to leave the prison each working day to do construction work, and directing appellant "to return immediately" to the prison "at the end of the working hours", and to pay the warden for board. The order concluded by providing:

"This Order may be revoked at any time, with or without notice to petitioner.

"The Warden shall report any infractions by [appellant] to the Court immediately."

On November 1 the sentencing judge revoked this order, without notice to appellant and without a hearing. The case comes before us on appeal from that revocation.

In response to the appeal the sentencing judge has filed a statement of the reasons for the revocation, as follows:

"The reasons for the Order of November 1, 1972, were as follows:

"(1) While on work release the defendant received a citation for operating a motor vehicle without an operator's license;

"(2) The defendant was not granted driving privileges in the Work Release Order;

"(3) On October 21, 1972, the defendant quit his job at Tor Builders of Weatherly, Pa., and did not give notice of such fact to James Smith, Director of the Work Release Program of Luzerne County nor to any member of the prison staff;

"(4) Despite leaving his employment the defendant continued to leave the prison for five days as if he were employed."

Appellant's counsel in his brief to us challenges the accuracy of the sentencing judge's statement of reasons, saying that appellant "has always maintained his innocence of the alleged motor vehicle violation, he denies that he ever operated a motor vehicle while on work release, and he denies that he terminated his employment. He would, upon hearing, admit to interruption of his employment but would show an adequate explanation that would tend to exculpate himself from wrongdoing."

In support of this statement there is attached to appellant's brief a copy of a letter of October 26, 1972, which was sent by appellant's counsel to the director of the work release program, with a copy to the sentencing judge. According to appellant's counsel, the sentencing judge entered the order revoking appellant's work release despite counsel's letter and on the strength of an apparently earlier but undated letter (a copy of which is also attached to appellant's brief) sent by the director of the work release program to the judge but not to appellant or appellant's counsel.

It may be that the sentencing judge did act on the basis of the undated letter from the director of the work release program, for the letter charges certain infractions by appellant of the conditions of his work release, and in the judge's statement of reasons for revoking work release these charges are repeated almost verbatim. The letters attached to appellant's brief, however, are not part of the record. Moreover, with respect to the letters, and also with respect to appellant's asserted ability to show that his work release should not have been revoked, the Commonwealth has stated in its brief that "[t]he additional facts set forth in Appellant's Statement of the Case are hereby denied since Appellee is without information or knowledge as to the truth of said facts."

On such a record we must refrain from any statements suggesting that we know either what letters were sent or whether appellant has a meritorious defense to the revocation of his work release. The only question properly before us is a narrow procedural question: When a sentencing judge places a prisoner on work release, may the judge revoke the work release order without notice to the prisoner and without giving the prisoner a hearing?

The pertinent statute is the Act of August 13, 1963, P. L. 774, as amended, 19 P.S. §1179.1. Section 1 of the Act provides: "Whenever any person has been sentenced to undergo imprisonment in a county jail or workhouse, hereafter referred to as a jail, for a term of less than five years the court, at the time of sentence or at any time thereafter upon application made therefor, may by order direct the sheriff, prison keeper, jail keeper, warden or other administrative head of a jail to permit the prisoner to leave the jail during necessary and reasonable hours for the purpose of working at his employment, conducting his own business or other self-employed occupation, including in the case of a

woman housekeeping and attending to the needs of her family, seeking employment, attendance at an educational institution or securing medical treatment. The order of court may be rescinded or modified at any time with or without notice to the prisoner."

It may be granted that the legislature could not have said more clearly that a sentencing judge is entitled to revoke a work release order without notice to the prisoner, and therefore without a hearing. The statute, however, remains subject to the requirement of the Fourteenth Amendment that it provide due process of law.

It is no answer to argue, as the Commonwealth has argued, that "[t]he work release program is a privilege for a prisoner". The right to procedural due process does not depend upon whether the benefit in question is claimed as a "right" rather than as a "privilege". Thus in *Morrissey v. Brewer*, 408 U.S. 471 (1972), it was said: "As Mr. Justice BLACKMUN has written recently, 'this Court now has rejected the concept that constitutional rights turn upon whether a government benefit is characterized as a "right" or as a "privilege." ' Graham v. Richardson, 403 U.S. 365, 374 (1971). Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.' Joint Anti-Fascist Refuge Committee v. McGrath, 341 U.S. 123, 168 (1951) (FRANKFURTER, J., concurring), quoted in Goldberg v. Kelly, 397 U.S. 254, 263 (1970). The question is not merely the 'weight' of the individual's interest, but whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment. Fuentes v. Shevin, 407 U.S. 67 (1972)." *Id.* at 481. *And see Sostre v. McGinnis*, 442 F. 2d 178, 195-96 (2d Cir. 1971) ; *Escalera v. N. Y. City Housing Auth.*, 425 F. 2d 853 (2d Cir. 1970).

Under this test a prisoner on work release is entitled to the protection of procedural due process before his work release may be revoked. This may be seen from a consideration of cases presenting analogous situations.

In *Morrissey v. Brewer, supra,* the question was whether a prisoner released on parole was entitled to procedural due process before his parole could be revoked. In examining this question the court considered first the nature of the parolee's interest in his continued liberty, and next the nature of the State's interest in revoking parole. With respect to the parolee's interest the court observed: "Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison. [Footnote omitted.] He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation. [Footnote omitted.] The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases the parolee faces lengthy incarceration if his parole is revoked." *Id.* at 482. With respect to the State's interest the court observed: "Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.

"Yet the State has no interest in revoking parole without some informal procedural guarantees. Although the parolee is often formally described as being 'in custody,' the argument cannot even be made here

that summary treatment is necessary as it may be with respect to controlling a large group of potentially disruptive prisoners in actual custody. Nor are we persuaded by the argument that revocation is so totally a discretionary matter that some form of hearing would be administratively intolerable. A simple factual hearing will not interfere with the exercise of discretion. Serious studies have suggested that fair treatment on parole revocation will not result in fewer grants of parole. [Footnote omitted.]" *Id.* at 483.

In *Sostre v. McGinnis, supra,* the question was whether a prisoner was entitled to procedural due process before he could be committed to solitary confinement, with a consequent forfeiture of "good time". Although describing itself as "particularly unwilling to interfere with state administrative processes when reliable, detailed information or empirical studies are as scanty as they are on the subject of prison disciplinary procedures", *id.* at 197, the court nevertheless held the prisoner entitled to due process, observing that "[i]f substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined", *id.* at 198. *And see Gray v. Creamer,* 465 F. 2d 179, 185 (3d Cir. 1972) (collecting cases).

There is no distinction of substance between these cases and the present case. Factually the situations vary, but in each a "grievous loss" of liberty is threatened, and in each the threatened individual has relied "on at least an implicit promise", *Morrissey v. Brewer, supra* at 482: the incarcerated prisoner, on the promise that he may remain in the general prison population so long as he obeys the prison regulations, and the parolee and the prisoner on work release, that they may remain outside the prison so long as they obey the conditions of their release. Nor does the interest of the State differ: just as it is consistent with the State's in-

terest in its ability to discipline and control an individual not to impose solitary confinement or to revoke parole "without some informal procedural guarantees", *Morrissey v. Brewer, supra* at 483, so it is with respect to the State's interest in its ability to revoke work release.

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer, supra* at 481. In answering this question as regards a parolee confronted with possible revocation of parole, the court in *Morrissey* held that "the minimum requirements of due process . . . include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.* at 489.

This standard is equally appropriate in the case of a prisoner confronted with possible revocation of work release. The only modification necessary is that in a case involving work release since the work release order is issued by a court, pursuant to statute, the revocation hearing should be before the court and not before some other neutral hearing body such as a parole board. This conclusion, it may be noted, is in harmony with cases

considering the procedural due process to which an incarcerated prisoner, as distinguished from a prisoner on work release, is entitled. Thus in *Sostre v. McGinnis, supra,* it was held: "In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, see Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950), and afforded a reasonable opportunity to explain his actions. [Footnote omitted.]" *Id.* at 198. *And see: Haines v. Kerner,* 404 U.S. 519 (1972); *United States ex rel. Neal v. Wolfe,* 346 F. Supp. 569 (E.D. Pa. 1972).

It is arguable that implicit in the definition of the minimum standards of procedural due process owed a prisoner is the right to be represented by counsel. *See* the opinion of Mr. Justice BRENNAN, concurring in *Morrissey v. Brewer, supra* at 490. As in *Morrissey,* however, that question need not be decided now, and is better left for discussion on a fuller record than we have here.

It should be observed that the conclusion that a work release order may not be revoked without giving the prisoner notice and a hearing does not mean that the hearing must always precede revocation. In *Gray v. Creamer,* 465 F. 2d 179 (3d Cir. 1972), the court, citing *Sostre v. McGinnis, supra,* recognized the possibility of an exceptional situation, holding that "the transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing does not, absent unusual circumstances not evident in the pleadings, meet minimal due process requirements." *Id.* at 185. In *Urbano v. McCorkle,* 334 F. Supp. 161 (D.N.J. 1971), the court said that "[I]n times of emergency situations, such process [notice

and a hearing before confinement of a prisoner in administrative segregation] may be postponed and emergency action taken. But the prisoners affected should thereafter be afforded within a reasonable time the minimal due process that is stated above." *Id.* at 168. And in *Biagiarelli v. Sielaff*, 349 F. Supp. 913 (W.D. Pa. 1972), the court's final decree and declaratory judgment, while providing that a prisoner could not be placed in solitary confinement or punitive or administrative segregation without notice of the charges and a hearing, also provided that "in case of an emergency threatening the security of the institution", notice was not necessary but did have to be given no later than 10 days after the confinement was imposed, with hearing to follow. *Id.* at 918. These decisions are consistent with *Morrissey v. Brewer, supra,* which is inconclusive on whether the revocation hearing should precede or follow confinement. In *Morrissey* the court, while emphazing that the opportunity for a hearing must be afforded "prior to the final decision on revocation", also added, without elaboration, that the hearing "must be tendered within a reasonable time after the parolee is taken into custody". *Id.* at 488. The facts before the court did not require decision of the point, but it is fair to infer from the court's insistence that a parolee's liberty not be arbitrarily terminated that, except as required by unusual circumstances, hearing should precede confinement.

It having been concluded that the last sentence of Section 1 of the Act of August 13, 1963, as amended, *supra,* 19 P.S. §1179.1, providing that a work release order "may be rescinded or modified at any time with or without notice to the prisoner", is invalid as inconsistent with minimum requirements of procedural due process, and despite that provision, there must be both notice and hearing, ordinarily before confinement but in any case a reasonable time thereafter, the question

is presented whether the remaining provisions of the Act are valid.

The presumption in favor of severability of statutory provisions is long-settled in Pennsylvania jurisprudence: "It is a familiar rule that a part of a statute may be unconstitutional and the remainder constitutional, and that which is constitutional will stand unless its provisions are so connected and dependent on each other in subject-matter that it must be presumed the legislature would not have enacted one without the other. Where the parts are so separable that each can stand alone, and it was evidently the legislative intent that the part held to be valid should be enforced, although the other part should fall, the part so sustained should be declared operative . . . . [Citations omitted.]" *Commonwealth v. Shaleen,* 30 Pa. Superior Ct. 1, 14 (1905).

In the present case the last sentence of Section 1 of the Act of August 13, 1963, as amended, *supra,* 19 P.S. §1179.1, is not so "connected and dependent" on the other provisions of the act "that it must be presumed the legislature would not have enacted one without the other". Precisely, the contrary is so. Section 2 of the Act provides for the collection by the prison authorities of the prisoner's wages. Section 3 provides for the disbursement of wages, board, travel, support of dependents, docket costs, and such obligations as judgments. Section 4 concerns employment of the prisoner in another county. And Section 5 authorizes the person "in charge of a jail [to] refuse to permit the prisoner to exercise his privilege to leave the jail for a period not to exceed five days for any breach of discipline or other violation of jail regulations". All of these provisions will be rendered more effective, and so more "capable of execution", by the conclusion that work release may not be revoked except after notice and hearing, just as the court in *Morrissey v. Brewer, supra,*

found that parole laws will be rendered more effective if parole may not be revoked except after notice and hearing.

Nor is there any basis to suppose that the legislature intended that the existence of work release programs should depend upon the sentencing judge having the power to revoke work release without notice and hearing. Apart from a few isolated, and far-sighted, decisions such as *Coffin v. Reichard,* 143 F. 2d 443 (6th Cir. 1944), the law of prisoners' rights is of recent declaration. *See, e.g., Gray v. Creamer, supra,* where in support of the proposition that "the Fourteenth Amendment . . . requires that certain safeguards accompany the imposition by state prison authorities of substantial punishment" the court cited a collection of cases, none decided before 1966, and most decided in the 1970's. The legislature cannot be said to have intended that the validity of provisions enacting a given program (work release) will depend upon the validity of a given procedural provision (revocation without notice) when at the time of enactment there was little to suggest that some years hence the procedural provision would be held unconstitutional. Particularly is this so when the elimination of the procedural provision does not weaken but strengthens the effectiveness of the remaining provisions.

Thus it follows that the Act of August 13, 1963, as amended, *supra,* 19 P.S. §§1179.1-1179.5, is valid, except for that portion of Section 1, 19 P.S. §1179.1, permitting revocation of a work release order without notice to the prisoner.

Appellant's work release having been revoked without notice or hearing, the order of revocation should be vacated and the matter remanded for further proceedings consistent with this opinion.

HOFFMAN and SPAULDING, JJ., join in this dissenting opinion.