Dr. Harry W. THERIAULT, Bishop, Church of the New Song of Universal Life, and Rector, The Fountainhead Seminary, Rev. Jerry M. Dorrough, Vice-Rector, The Fountainhead Seminary, and Minister, Church of the New Song of Universal Life, et al.

v.

Norman A. CARLSON, Director, Bureau of Prisons; Rev. Frederick Silber, Director of Chaplaincy Services, Bureau of Prisons; J. D. Henderson, Warden, United States Penitentiary, Atlanta, Georgia; Rev. Jack A. Hanberry, Protestant Chaplain, United States Department of Justice, Bureau of Prisons, United States Penitentiary, Atlanta; Fr. Raymond A. Beane, O.M.F., Catholic Priest, United States Department of Justice, Bureau of Prisons, United States Penitentiary, Atlanta.

Civ. A. No. 13872.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 25, 1972.

Harry W. Theriault, pro se (Glenn Zell, Atlanta, Ga., of counsel), for plaintiffs.

John W. Stokes, Jr., U. S. Atty., P. Bruce Kirwan, Asst. U. S. Atty., Atlanta, Ga., for defendants.

## OPINION AND ORDER

### OPINION

EDENFIELD, District Judge.

Harry William Theriault, self-styled Bishop of Tellus[1] and self-proclaimed leader of a group designated by petitioners as the Church of the New Song,[2] is also a federal prisoner incarcerated presently in the Atlanta federal penitentiary on "holdover" status from the Marion (Illinois) federal penitentiary. For a year and a half he has sought to compel prison officials in Atlanta and Marion to grant him the right to hold religious services in prison for those who shared his belief in the Eclatarian faith,[3] a faith of which he is the supreme exponent. The prison authorities denied his requests and his appeals to respondent Silber, Director of Chaplaincy Services for the Bureau of Prisons, and respondent Carlson, Director of the Bureau of Prisons, were unsuccessful. Petitioners then filed this class action here and the court, predicating its jurisdiction upon 28 U.S.C. § 1361 (1970), held four full days of hearings on the matter. Walker v. Blackwell, 360 F.2d 66 (5th Cir. 1966). ("Walker I".) The court has concluded that petitioners and the class they represent have been denied First Amendment rights, and it will order relief.

A full recitation of the history of this case is unnecessary. Briefly, Theriault and co-petitioner Dorrough founded the Church of the New Song and the Fountainhead Seminary in 1970 while incarcerated in Atlanta. They had obtained "doctor of divinity" certificates from a mail-order organization and, as a "game", they decided to challenge the chaplaincy program in the federal prisons and, at the same time, to develop a new religion of their own. The petition filed in this court alleged that the Government had established religion in the Atlanta penitentiary and was also prohibiting its free exercise by those prisoners who belonged to the Church of the New Song. Petitioners claimed that a "pall of establishment orthodoxy" had been cast over their lives because re-

1. Theriault testified that he derives his authority to be "Bishop of Tellus" (Bishop of the Earth) from the Book of Revelations of the New Testament. Chapter 3, Verse 3 of the Book of Revelations states:

"Remember then what you received and heard; keep that, and repent. If you will not awake, *I will come like a thief*, and you will not know at what hour I will come upon you." (Emphasis added.)

Theriault, who is incarcerated for robbery, claims that he is that "thief".

2. Theriault testified that the name of the Church is derived from the "new song" that the younger generation is now singing as well as from the "new song" of the new era described in the Book of Revelations, 5:9 and 14:3 (". . . and they sang a new song.").

3. According to Theriault, Eclat is the "new name" of the divinity referred to in the Book of Revelations, 3:12. The Eclatarian faithful, aside from one secretary, are to be found only in the federal penitentiaries of Atlanta and Marion.

spondents Hanberry and Beane, the Protestant and Catholic chaplains, respectively, who were members of the prison staff and federal employees, regularly submitted reports on the religious activities of the prisoners which had a direct bearing on the grant or denial of parole. They also contended that the chaplains were promoting the majority faiths at the expense of minority faiths by failing to grant religious standing to the Church of the New Song. The petition was supported by the signatures of 165 prisoners.

Immediately after the petition was allowed filed in this court, Theriault was transferred to Marion which houses the most severe security risks in the federal system. Theriault now began to take his own religious claims seriously and attempted to explain them to the prisoners and staff at Marion. The Chief of Classification and Parole at Marion testified in this court that, at this point, Theriault's activities were truly religious in nature. Theriault approached the Protestant chaplain at Marion for permission to hold religious services for himself and his followers, but the request was denied because the chaplain felt the Church of the New Song was not "recognized." Theriault attempted to meet this objection by assuring the chaplain he would obtain an official church charter from the Universal Life Church, Inc., the mail-order organization which supplied Theriault with his "doctor of divinity" degree. The chaplain brought the matter to the attention of respondent Silber,[4] and Rev. Silber testified in court that he upheld the decision of the Marion chaplain because the Church of the New Song and the Eclatarian faith were not "recognized." Theriault also wrote to respondent Carlson but received only a form response directing him to the institutional staff.

As Theriault continued his activities among the Marion prisoners, the staff began to suspect that he was actually organizing a radical political movement. One staff member filed a memorandum on the subject and urged that something be done to control Theriault's activities.[5]

---

4. The text of the chaplain's letter to Rev. Silber is as follows:
"FREDERICK SILBER,    25 Sept 70
DIRECTOR OF CH. SERV.
BUREAU OF PRISONS,
WASHINGTON, D. C.
WILLIAM G. EZELL,
PROTESTANT CHAPLAIN,
U. S. PENITENTIARY,
MARION, ILLINOIS
RECOGNITION OF CHURCH
    GROUPS
    As you know, Harry Theriault, #90987, was transferred to Marion from the Atlanta penitentiary. He represents himself as a Bishop in the Church of the New Song.
    His initial moves to have use of the chapel, distribute literature and hold study classes have been denied. The reason for such denial is that he is not recognized as a church. He now comes with a letter addressed to a Universal Life Church in Modesto, California requesting a church charter, etc. It is reported that he has this kind of charter for the church he had in the penitentiary in Atlanta. There are no doubt 'diploma mills', etc., who for fees or favors would send him the necessary papers and documents. We will have a check by a probation officer in this area made on this particular man and church.
    When Theriault is denied one place, he goes another. He has some of our staff involved now in his requests for recognition. There is little question that if we deny his efforts to secure documents that there will be writs, etc. Therefore, if you have previous experience in similar cases or could advise us it would be appreciated. Also, we want to advise you of this case so you would not be unaware.
    The move with him has been made with diplomacy and while it is not an emergency, it could develop. Any help in this matter would be appreciated.
    WGE: kw"

5. The text of the memorandum is as follows:
"SUBJECT: Theriaults activities and organization of inmates. (90987–131)
    During the past quarter in 'F' unit, I have observed Theriaults activities, both in and out of the unit. Following is a listing of incidents and observations that has led me to believe he has formulated a strong, radical power structure in this institution and others.

Three days after the memorandum was filed, Theriault was placed in punitive segregation ("H–Unit") for failing to obey the order of a security officer to move. He was subsequently released and later cited for a minor violation and for threatening a security officer. On April 1, 1971 Theriault approached Mr. J. Culley, a correctional supervisor, and demanded a place to hold religious services. Culley discussed the matter with Theriault but refused to accede to his demand. Then, "as a preventive measure," Culley had Theriault placed in punitive segregation ("H–Unit").[6] Theriault remained in H–Unit from that

Also, it would not be hard to believe, he may have some followers on the outside.

Theriault has organized a group called 'The New Church of World Song' or something similar to this. He is the leader and members address him as the Bishop. Others have been ordained as ministers by him. I have no idea, as to how large this organization might be. Some investigation would reveal this.

Kessler 1707–135, E–B–10, attempted to assist Theriault in his duties as F orderly, a few weeks ago. Both were warned and Kessler sent out of the unit. This time I was informed Kessler was one of his ministers and as such should be allowed to assist him.

Theriault was greatly upset, when Gomez F–C–18, was taken to H unit the first time and became very inquisitive after informing me this was another of his ministers and seemed to convey to me that he should be given this information because he was Gomez Bishop.

He has constantly kept occupied, writing writs and other legal papers for the inmate population. This seems to be a very big business, that occupies most of his time.

Arnold from I unit recently made an attempt to assist in the orderly work and again both were warned. Minshew F–A–9 has assisted Theriault on a few occasions, before being assigned to the Food Service detail.

Mr. Tremper returned some papers to him recently, advising him they could not be sent out. He immediately asked me to call Mr. Keohane. I complied and was advised that Mr. Edmonds was in charge that day. Mr. Edmonds would not give Theriault permission to send the papers out. Theriault became very upset and proceeded to say this was a conspiracy to prevent him from mailing this material. He proceeded to use several colorful adjectives to describe Mr. Edmond to Welty F–A–8. I advised him to be careful in using these terms in relation to staff members. His comment was 'Freedom of speech, man.' During the discussion, Welty advised him, the matter should be taken to the Warden and not mess with these people.

Theriault became quiet frustrated after not being allowed to visit Alderisio 85719–132 in the hospital (12–10–70). He seemed to think regulations does not apply to him as one befitting his position.

I was told he held a meeting in the V.T. building (12/11/70), with several members of his group. This can be verified by the Supervisor of the evening watch and the V.T. officer. He left the unit 12/12/70 with a Bible. I believe he conducted a meeting somewhere on this date. This would need some checking. Gomez attempted to attend Mr. Sumners group on this date but suddenly changed his mind. He seemed to have some purpose in checking the group.

I have observed Cappola 1642–135, Heard, Kolburg 27388–138 and several other inmates, either contacting or being contacted by Theriault.

Considering these incidents and other information gathered during these past days, I feel Theriault has shown great disregard for the institutional authority and regulations and has went about setting up this organization, with him as the central power figure, utilizing the talents of several key figures as ministers. This group has members of all races and has the characteristics of an extremist group on the far left, completely against the system (whatever it may consist of) and will let nothing stop or stand in its way.

It is my opinion, that if something is not done to control the activities of Theriault, we will have an incident in the near future causing damage to the institution proper or injuries to personnel to compel agreement to the groups demands."

6. The text of the report prepared by Culley on the incident is as follows:

"At approximately 5:30 p m this evening Theriault approached Mr. J. White C/S and myself in the east corridor and demanded a place to hold a religious service. I explained to him that to hold a meeting of a religious nature he would have to obtain approval

night until he was transferred to Atlanta for the hearings before this court.[7] The day Theriault was received back in Atlanta he was immediately placed in the segregation unit and he is still there today.[8] The court finds as fact that the sole basis for the punitive segregation of Theriault was his demand to hold religious services.

### A. *The "Establishment" Claim*

The "establishment" claim raised by petitioners is, for the most part, without merit. The Bureau of Prisons is statutorily charged with the responsibility of providing for the care, subsistence, protection, instruction and discipline of federal prisoners. 18 U.S.C. § 4042 (1970). The Bureau has carried out this responsibility by creating programs to meet the needs of the inmates—be they physical, mental, or spiritual needs. In order to effectuate these programs the Bureau, of course, must hire professional staff—doctors, social workers, teachers, and clergymen. The Bureau cannot maintain a full complement of medical, educational, or religious professionals on the prison staffs, and a representative selection must necessarily suffice. The ordained clergymen on the federal payroll who serve as chaplains in the federal prison system are hired to provide for the spiritual needs of *all* prisoners, whatever their religious denomination, and they are not merely the emissaries of their respective churches. As Mr. Justice Brennan has written:

"There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain

of the Administration by working through the Chaplain. He would not accept this as an answer to his question or demand. At this time he appeared to be getting emotional, so I asked him to step into the office and we would discuss the matter.

"To take away the opportunity of Theriault creating an incident, if he so desired, I kept him in the office until the evening yard was closed and we had began to count.

"During our talk in the office, Theriault still demanded to be permitted to worship his lord in a place where other inmates could come if they so desired.

"He stated he would hold his services and if I attempted to break it up, I would have to resort to violence because no one would leave if I instructed them to leave. As Theriault left the office for count he commented, I will do what I feel I have to.

"As a preventive measure toward any type of incident taking place as he indicated, I placed him in H–Unit immediately after count before the general population was released for evening activities.

"Theriault offered no resistance during the move. He asked if this was my decision or had I called someone. I told him it was mine. He then stated, 'Can't we come to an understanding, I didn't say I was going to do it tonight.' He further stated that he would do as I instructed.

"In H–Unit Theriault refused to remove his clothing for a shakedown. It was very clear that he wanted the staff to man-handle him. His pockets were emptied, belt removed and he was given a very thorough frisk shakedown. To assure the chance of contraband not being introduced into the unit, Theriault was placed in a closed front cell.

NOTE: At approximately 9:00 p m I visited with Theriault in H–Unit. I asked if he was willing to submit to a strip shakedown. He stated, 'I am not playing your silly games and if you try something there will be violence.' I advised him again why he was in the closed front cell and if he submitted to the shake-down I would move him to the front at this time. He would not have anything to do with the request.
/s/ JC"

7. That night Theriault destroyed part of his H–Unit cell and the next day both kicked and threatened a security officer.

8. On October 28, 1971, prior to Theriault's transfer to Atlanta, the Special Intelligence Supervisor at the Atlanta penitentiary circulated a memorandum advising all staff that Theriault was to be placed in segregation upon his reception at Atlanta and was not to be removed from segregation without the approval of the Associate Warden—Controls. When Theriault was received back at Atlanta on November 6, 1971, he was placed in the Segregation Unit in accordance with the October 28th memorandum.

religious liberties also protected by the First Amendment. Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example. The like provision by state and federal governments for chaplains in penal institutions may afford another example. It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be. . . .

"Such activities and practices seem distinguishable from the sponsorship of daily Bible reading and prayer recital. For one thing, there is no element of coercion present in the appointment of military or prison chaplains; the soldier or convict who declines the opportunities for worship would not ordinarily subject himself to the suspicion or obloquy of his peers. Of special significance to this distinction is the fact that we are here usually dealing with adults, not with impressionable children as in the public schools. Moreover, the school exercises are not designed to provide the pupils with general opportunities for worship denied them by the legal obligation to attend school. The student's compelled presence in school for five days a week in no way renders the regular religious facilities of the community less accessible to him than they are to others. The situation of the school child is therefore plainly unlike that of the isolated soldier or the prisoner.

"The State must be steadfastly neutral in all matters of faith, and neither favor nor inhibit religion. In my view, government cannot sponsor religious exercises in the public schools without jeopardizing that neutrality. On the other hand, hostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion, the withholding of draft exemptions for ministers and conscientious objectors, or the denial of the temporary use of an empty public building to a congregation whose place of worship has been destroyed by fire or flood. . . . " Abington School District v. Schempp, 374 U.S. 203, 296–299, 83 S.Ct. 1560, 1610, 10 L.Ed.2d 844 (1963) (concurring opinion).

The court concludes that the maintenance by the Bureau of Prisons of chaplains at the Atlanta federal penitentiary is not unconstitutional. *See* Horn v. People of California, 321 F. Supp. 961 (E.D.Cal.1968).

Notwithstanding this conclusion, the court does find merit in petitioners' claims about the filing of religious reports by respondents Hanberry and Beane. The testimony before this court established that Rev. Hanberry and Fr. Beane regularly submit reports to the caseworkers at the Atlanta penitentiary in which they comment on the inmates' participation or lack of participation in their respective religious activities. These reports, together with reports from other staff members, are culled by the caseworkers and form part of the inmates' profiles which are presented to the Board of Parole when the inmates are being considered for release on parole. It is not inconceivable that the grant or denial of parole is based, to some degree, on the religious reports submitted by the chaplains.

In the court's view, the submission of religious reports by respondents Hanberry and Beane involves the Government in a violation of the neutrality it must maintain with respect to religion. There can be no doubt that an inmate whose file contains a positive religious

report stands a better chance of being released on parole than an inmate with a neutral or negative religious report. Indeed, it is likely that the inmates' very knowledge of the existence of these religious reports may compel some to participate in religious activities. The Government, by allowing these religious reports to be submitted, is in effect promoting religion among inmates and indirectly punishing the atheist, agnostic, or Eclatarian who declines to participate in these religious programs. This is unconstitutional. As the Supreme Court has declared:

"Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." Epperson v. Arkansas, 393 U.S. 97, 103–104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968).

The court will accordingly enjoin the submission of these religious reports by respondents Hanberry and Beane.

### B. *The "Free Exercise" Claim*

■■ The chaplains at Atlanta and Marion, as well as Rev. Silber, denied Theriault's requests to hold religious services because they felt the Church of the New Song and the Eclatarian faith were not "recognized." The insistence by these federal employees that Theriault and his followers meet this "recognition" standard before they might freely exercise their religious beliefs runs squarely afoul of the First Amendment.[9] One of the purposes of the First Amend-

ment was to prohibit the imposition by government of *any* standard as a prerequisite to the free exercise of religion. As the Supreme Court has noted:

"By the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the dangers of a union of Church and States. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services. They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power." Engel v. Vitale, 370 U.S. 421, 429, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962).

But respondents go further. They argue that Theriault's "religion" is not a religion at all but merely a random amalgamation of pseudo-political notions; that his "church" is nothing but a collection of some of the worst prisoners in the federal system. Similar arguments were offered by prison officials when so-called Black Muslim prisoners began suing in federal court for religious freedom. One of the first courts to deal with these arguments responded as follows:

"Under freedom of religion in this country a person has an absolute right to embrace the religious belief of his choice. The Constitution does not define 'religion' and reference to standard sources of the meaning of words indicates that there is not complete

---

9. It appears also to run afoul of Policy Statement 7300.43A of the Bureau of Prisons which was issued by respondent Carlson. That Statement commits the Bureau to extending the greatest amount of religious freedom possible within a prison context to committed offenders, and assisting them in the practice of "the religion of their choice." Nowhere in that Statement is there an indication that only "recognized" religions can be practiced.

agreement on even a definition of the term. Nor is it the function of the court to consider the merits or fallacies of a religion or to praise or condemn it, however excellent or fanatical or preposterous it may be. Whether one is right about his religion is not a subject of knowledge but only a matter of opinion.

"It is sufficient here to say that one concept of religion calls for a belief in the existence of a supreme being controlling the destiny of man. That concept of religion is met by the Muslims in that they believe in Allah, as a supreme being and as the one true god. It follows, therefore, that the Muslim faith is a religion." Fulwood v. Clemmer, 206 F.Supp. 370, 373 (D.D.C.1962).

The record in this case amply reflects the tenets, such as they are, of the Church of the New Song and the Eclatarian faith. The Eclatarian faithful worship a divine and universal spirit which they identity as "Eclat" and which they believe manifests itself in all animate and inanimate objects. Since each person is thought to possess some of this universal spirit, the Eclatarians believe that loneliness may be overcome and true brotherhood achieved if people became more conscious of Eclat. Petitioners have their own Eclatarian Bible, their own Eclatarian newsletter ("The Leaves"), their own religious nomenclature, and various other religious paraphernalia. A number of inmates testified before this court that Theriault and his teachings have had a positive, rehabilitative effect upon their lives and have inspired them religiously. This court is not unmindful of the very real possibility that petitioners are still engaging in a "game" and attempting to perpetrate a colossal fraud upon both this court and the federal prison system. Nevertheless, with all due respect to respondents, the court cannot declare petitioners' religion illegitimate.

■ Respondents contend, however, that even if the Eclatarian faith is not illegitimate, they need not permit its free exercise in prison because Theriault and his followers are violent and threaten the security of the prison. Certainly if respondents could show that a compelling and substantial public interest required the subjugation of petitioners' First Amendment rights, they would prevail. Walker v. Blackwell, 411 F.2d 23 (5th Cir. 1969) ("Walker II").[10] But the burden upon respondents is heavy, and a cursory review of the Black Muslim cases reveals how very heavy that burden is.

In Cooper v. Pate, 324 F.2d 165 (7th Cir. 1963), a state prisoner had filed a civil rights claim alleging that he was confined in punitive segregation and deprived of religious rights because he was a Black Muslim, and the district court had dismissed the prisoner's petition. On appeal the Attorney General of the State of Illinois asked the Seventh Circuit to take judicial notice of certain social studies purporting to show that, "despite its pretext of a religious facade," the Black Muslim Movement was an organization dedicated to the overthrow of the white race and to the incitement of riots and violence inside

---

10. This same standard has been applied in cases dealing with state institutions. *E. g.*, Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971). In Long v. Parker, 390 F.2d 816 (3d Cir. 1968), and Banks v. Havener, 234 F.Supp. 27 (E.D.Va.1964), however, a "clear and present danger" test was enunciated. In a thoughtful note, Judge Higginbotham has suggested that the "clear and present danger" test might be inapplicable in the context of a prison community and that a less rigorous "clear and *probable* danger" test might be more appropriate so that prison officials need not suffer a catastrophic riot in order to create a factual record sufficient to justify the imposition of restraints. Knuckles v. Prasse, 302 F.Supp. 1036, 1048–1049 (E.D.Pa.1969). aff'd 435 F.2d 1255 (3d Cir. 1970), cert. denied, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

Judge Higginbotham's observations have much appeal. However, in the instant case, this court concludes that respondents have not even shown a clear and *probable* danger emanating from Theriault or the Church of the New Song.

prison walls. The Attorney General also asked the court to take judicial notice of an official police study which documented numerous acts of violence committed by members of the Black Muslim Movement in a variety of state and federal prisons, including the Atlanta federal penitentiary. The Seventh Circuit agreed to take judicial notice of these studies and affirmed the lower court's dismissal of the petition. The Supreme Court reversed and held that the petition stated a valid cause of action. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). On remand, the district court enjoined prison officials from denying the petitioner and other Black Muslim prisoners the right to communicate with and visit ministers of their faith and the right to attend religious services conducted by them. The Seventh Circuit affirmed. Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967).

Similarly, in Long v. Parker, 384 U.S. 32, 86 S.Ct. 1285, 16 L.Ed.2d 333 (1966), the Supreme Court vacated the judgment of a district court, which had been affirmed by the Third Circuit, dismissing the petition of a Black Muslim prisoner at the federal penitentiary in Lewisburg, Pennsylvania who complained of the deprivation of religious' rights. On remand, the district court denied relief and relied on its decision in Desmond v. Blackwell, 235 F.Supp. 246 (M.D.Pa.1964). In *Desmond* the district court found that Black Muslim meetings were devoted to the doctrine of hate, that those attending such meetings referred to staff as "monsters of inferior intelligence," "devils," and "skunks," that the supervision of such meetings caused a depletion in the staff force and made it less available for other duties, that militarily-trained prisoners known as the Fruit of the Islam stood guard at the entrance to the meetings, that some Black Muslims assaulted and stabbed another prisoner in order to induce him to join their faith, and that when disciplinary action had to be taken against one member of the group the entire membership approached the control center of the institution and demanded his release from administrative segregation. On appeal, however, the Third Circuit vacated the judgment of the district court and remanded the case for further proceedings. Long v. Parker, 390 F.2d 816 (3d Cir. 1968). The court found that the district court's reliance on *Desmond* was misplaced and that:

> "Mere antipathy caused by statements derogatory of, and offensive to the white race is not sufficient to justify the suppression of religious literature even in a prison. Nor does the mere speculation that such statements may ignite racial or religious riots in a penal institution warrant their proscription." At 822.

No one has testified that the Church of the New Song preaches hate. There was evidence that Theriault kicked a prison official, destroyed government property, threatened security officers,[11] and sent vile letters to a federal district judge in Illinois.[12] However, in view of the Black Muslim cases, this court cannot say on the basis of this evidence that Theriault or his group are so menacing that they should not be allowed to freely exercise their religion.

The court finds that respondents have failed to show a sufficiently com-

---

11. Prison officials from Marion testified that Theriault's threats caused them to fear he and his group might engage in violent and disruptive actions, and they characterized Theriault as a serious security risk. However, in response to questions from the bench, these officials admitted that they would characterize *all* the inmates at Marion as serious security risks, and that regular worship services are held at Marion for these inmates.

12. It is a federal offense to send any mail which threatens to injure the person of the addressee. 18 U.S.C. § 876 (1970). A person who commits this offense is liable to a $10,000 fine or up to five years in prison. The vile letters which Theriault sent to the judge were brought to the attention of the warden at Marion and respondent Carlson. Nevertheless, the letters were apparently not deemed sufficiently threatening to warrant criminal prosecution.

pelling public interest requiring the subjugation of petitioners' First Amendment rights.[13] *Walker II, supra.* Accordingly, it must grant petitioners appropriate relief so they may freely exercise their rights within the context of a prison community.

### 1. *Religious activities*

██ This court interprets the First Amendment as guaranteeing the right of federal prisoners who share a common religion to gather for devotional meetings and to study the teachings of that religion. This right cannot be denied the members of the Church of the New Song. Since respondent Carlson has already promulgated a detailed policy statement—Bureau of Prisons Policy Statement 7300.43A—concerning the religious rights of federal prisoners, the court need only order him to direct prison authorities to apply that policy to petitioners.

Policy Statement 7300.43A authorizes the scheduling of worship services, religious activities, and meetings of a religious nature "with reasonable frequency" for all committed offenders under supervisory procedures established by the warden. It also directs the prison chaplains to allocate a proportionate share of the funds they receive to meet the religious needs of interested faith groups. Thus, for example, the Black Muslims at the Atlanta penitentiary are given meeting space and permitted to meet twice weekly. Respondent Beane, who serves as their advisor in religious matters, reproduces religious material for the Muslims on institutional equipment, permits them the use of a tape recorder, and coordinates the purchase of various religious books from the funds of the institution. Bethea v. Daggett, 329 F.Supp. 796 (N.D.Ga.1970), aff'd. 444 F.2d 112 (5th Cir. 1971). This is not to say, of course, that respondents must pay for all the printing petitioners seek or that the members of the Church of the New Song may collect "tithes" to fund their own activities. As in other areas, prison officials should wisely use their discretion in the handling of these matters.

██ Since there are no ministers of the Eclatarian faith outside prison walls, prison authorities may not disqualify Theriault from leading religious services for his Church. *See* Bethea v. Daggett, *supra.* This does not mean Theriault is to be treated as a privileged person; he has no more "right" to a beard than any other inmate. Brooks v. Wainwright, 428 F.2d 652 (5th Cir. 1970); Brown v. Wainwright, 419 F.2d 1376 (5th Cir. 1970). And while Theriault may preach the doctrines of his faith—including the "Eclatarian Demandate of Natural Rights"—at his religious gatherings, any proclamations by him urging violence, riots, or insurrection, may be suppressed by prison authorities and may afford the authorities with a sufficient reason to discontinue the activities of the Church of the New Song. Knuckles v. Prasse, 302 F.Supp. 1036 (E.D.Pa.1969), aff'd. 435 F.2d 1255 (3d Cir. 1970), cert. denied, 403

---

13. The issues involved in this case might also be cast in an "equal protection" setting. Although the instant case involves a federal penal institution and the actions of federal employees so that the Equal Protection Clause of the Fourteenth Amendment is inapplicable, the Supreme Court has read "equal protection" notions into the Due Process Clause of the Fifth Amendment (which does apply to the federal government) and has held that federal action may be so discriminatory as to be violative of due process. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Schneider v.

Rusk, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

Nevertheless, since this court finds ample room within the Free Exercise Clause to cover the issue in this case (see Brown v. Peyton, supra) and since the Supreme Court itself has warned that the "equal protection" and "due process" concepts may not be always interchangeable (Bolling v. Sharpe, supra at 499, 74 S.Ct. 693), the court will rest its conclusions on the First Amendment.

U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971).

2. *Religious Correspondence*

■ The Fifth Circuit has held that Black Muslims and other federal prisoners may correspond with their religious leaders for spiritual guidance and advice. *Walker II, supra.* It follows that members of the Church of the New Song may correspond with their religious leader—Theriault—for spiritual guidance and spiritual advice.

■ Of course, prison authorities may ascertain the contents of such correspondence to make certain that what is sought is spiritual guidance and spiritual advice. However, they may not simply characterize all correspondence of the members of the Church of the New Song as "nonreligious" because of their subjective evaluations of the Eclatarian faith.

■ Theriault has no "right" to correspond with famous personalities to solicit funds for his Church. Such correspondence falls outside the scope of First Amendment protection and may be controlled by prison officials in the customary manner. Shack v. Wainwright, 391 F.2d 608 (5th Cir.), cert. denied, 392 U.S. 915, 88 S.Ct. 2078, 20 L.Ed.2d 1375 (1968).

3. *Punishment for Religious Activities*

■ This court has found as fact that Theriault was placed in punitive segregation at Marion on April 1, 1971 solely to prevent him from holding religious services for himself and his followers. He remained in punitive segregation thereafter and upon his transfer to Atlanta for the hearings before this court he was summarily placed in punitive segregation, where he is today.

Since the Marion authorities unconstitutionally denied Theriault his First Amendment rights and confined him in punitive segregation solely because he sought to exercise those rights, his present confinement in punitive segregation is unlawful and he must be restored to the general prison population. Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967); Howard v. Smyth, 365 F.2d 428 (4th Cir. 1966), *cert. denied,* 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966).[14] *The court reiterates that authorities may take whatever disciplinary measures are necessary—including the imposition of punitive segregation—if Theriault or his group begin to preach insurrection or violence or if they violate institutional rules and regulations requiring punishment subsequent to the date of this opinion and order.*

4. *Other Matters*

Petitioners have raised four other issues which the court finds are unrelated to the central claim. They pray for:

(1) The right to give legal advice to all members of their faith:

(2) The right, at disciplinary hearings, to:
  (a) a written copy of the charge,
  (b) a hearing before an impartial official,
  (c) cross-examine accusers, call witnesses, and have legal counsel or counsel substitute, and
  (d) written decisions with specific findings and supporting conclusions;

(3) The right to subscribe to and receive an Atlanta weekly publication called "The Great Speckled Bird"; and

(4) The right to freely communicate with the press and the publishing media.

■ There has been no showing that respondents have prevented inmates —whether they be members of the Church of the New Song or not—from

14. There is no basis in the record to support Theriault's claim that he was transferred to Marion in 1970 solely because he filed his petition in this court. Had there been such a basis, the court might have branded the transfer an abuse of administrative discretion. *Cf.,* Lawrence v. Willingham, 373 F.2d 731 (10th Cir. 1967).

furnishing legal assistance to other inmates in contravention of Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969), and Wainwright v. Coonts, 409 F.2d 1337 (5th Cir. 1969). Of course, prison officials may regulate the legal activities of inmates and petitioners have not shown that respondents have arbitrarily or capriciously regulated their legal activities. *See* Arey v. Peyton, 378 F.2d 930 (4th Cir. 1967).

■ This court is aware that some recent decisions dealing with state prisons have granted the procedural due process rights sought by petitioners. *E. g.,* Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971). Nevertheless, the court finds itself in agreement with the observation of the Second Circuit that the federal prisons already afford inmates due process in disciplinary hearings (*see* Bureau of Prisons Policy Statements 7400.6A) and that those procedural rights which are not afforded are not constitutionally mandated. *See* Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), petition for cert. filed, 40 U.S.L.W. 3170 (U.S. Aug. 18, 1971) No. 71–246).

■ No evidence was adduced at the hearings that petitioners ever requested "The Great Speckled Bird" or that such requests, if made, were denied. Petitioners do not contend that this publication is a religious newsletter of the Church of the New Song and no "free exercise" issue is involved. *Cf.* Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968). Prison officials may make reasonable regulations as to the circulation of magazines and newspapers and this court will not interfere with such administrative matters. Royal v. Clark, 447 F.2d 501 (5th Cir. 1971).

■ Finally, the court notes that Bureau of Prisons Policy Statement 1220.1A (February 11, 1972) now permits federal prisoners full access to the news media through the Prisoners Mail Box. The court also notes that under Bureau of Prisons Policy Statement 7300.46 federal prisoners may submit manuscripts for publication so long as they do not deal with the details of the author's life, other inmates, criminal careers, and matters currently in litigation, and so long as they do not jeopardize the security and discipline of federal prisons. The court does not find the limitations in Policy Statement 7300.46 unconstitutional and will not interfere with it. Royal v. Clark, *supra.*

### ORDER

For the foregoing reasons petitioners' petition for injunctive and other relief is granted in part and denied in part. It is granted in part as follows:

(1) Respondents Hanberry and Beane are enjoined from preparing or submitting oral or written reports to other staff members of the Atlanta federal penitentiary concerning the religious activities of individual inmates at that penitentiary;

(2) Respondent Carlson and respondent Silber are ordered to direct prison authorities under their jurisdiction to grant petitioners the right to freely exercise their religion, including the right to correspond with petitioner Theriault for the purpose of seeking spiritual guidance, as regulated by Bureau of Prisons Policy Statement 7300.43A and in accordance with the opinion of this court;

(3) Respondent Henderson is hereby ordered to immediately release petitioner Theriault from confinement in punitive segregation and restore him to the general prison population; and

(4) Respondent Carlson is hereby ordered to instruct prison authorities under his jurisdiction that they may not re-impose confinement in punitive segregation upon petitioner Theriault unless Theriault violates an institutional rule or regulation requiring such confinement subsequent to the

date of this opinion and order or incites riot or insurrection during the conduct of his religious activities subsequent to the date of this opinion and order.

In all other respects it is denied.

It is so ordered.